**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 19-cr-545 (CM) |
| | ) | |
| MICHAEL CARROLL and | ) | |
| MICHAEL PAPPAGALLO, | ) | |
| | ) | |
| Defendants. | ) | |

**MICHAEL CARROLL'S OPPOSITION TO BRIXMOR PROPERTY GROUP, INC.'S**
**MOTION TO QUASH CERTAIN REQUESTS IN CARROLL'S RULE 17(c)**
**SUBPOENAS**

## TABLE OF CONTENTS

Statement of Facts ................................................................................................................. 2

    I.     Background ........................................................................................................ 2

    II.    Rule 17 Subpoenas .......................................................................................... 3

Argument ............................................................................................................................. 5

    I.     Legal Standard ................................................................................................. 5

    II.    The Challenged Request is Proper Under *Nixon* ........................................... 8

    III.   The Burden to Brixmor Does Not Justify Quashing the Subpoena ............... 14

Conclusion ......................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bowman Dairy Co. v. United States*,
  341 U.S. 214 (1951)............................................................................................................7

*Brady v. Maryland*,
  373 U.S. 83 (1963)............................................................................................................9

*Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*,
  105 F.R.D. 16 (S.D.N.Y.1984) ...............................................................................14, 15

*In re Irving*,
  600 F.2d 1027 (2d Cir. 1979)..........................................................................................12

*United States v. Bergstein*,
  16 Cr. 00746 (PKC), 2018 WL 9539846 (S.D.N.Y. Jan. 24, 2018) ........................11

*United States v. Binday*,
  12 Cr. 00152 (CM), 2013 WL 4494659 (S.D.N.Y. Aug. 15, 2013) .........................6

*United States v. Libby*,
  432 F. Supp. 2d 26 (D.D.C. 2006) ................................................................................11

*United States v. Nachamie*,
  91 F. Supp. 2d 552 (S.D.N.Y. 2000)..........................................................................6, 7

*United States v. Nixon*,
  418 U.S. 683 (1974).................................................................................... *passim*

*United States v. Nosal*,
  291 F.R.D. 403 (N.D. Cal. 2013) ...................................................................................7

*United States v. Rajaratnam*,
  753 F. Supp. 2d 317 (S.D.N.Y. 2011).................................................................7, 11, 12

*United States v. Sawinski*,
  No. 00 Cr. 00499 (RPP), 2000 WL 1702032 (S.D.N.Y. Nov. 14, 2000) ...............12

*United States v. Stein*,
  488 F. Supp. 2d 350 (S.D.N.Y. 2007).......................................................................6, 14

*United States v. Tucker*,
  249 F.R.D. 58 (S.D.N.Y. 2008) ......................................................................................6

*United States v. Weisberg*,
   08 Cr. 00347 (NGG), 2011 WL 1327869 (E.D.N.Y. Apr. 5, 2011) .......................................12

**Statutes, Rules and Regulations**

Fed. R. Civ. P. 26(b)(1) ...........................................................................................................7

Fed. R. Crim. P. 16 ............................................................................................................1, 4, 7

Fed. R. Crim. P. 17 .......................................................................................................... *passim*

Fed. R. Evid. 803(6)(B). .........................................................................................................11

**Other Authorities**

U.S. Const. amend. VI...............................................................................................................5

Defendant Michael Carroll, by and through undersigned counsel, respectfully submits this memorandum in opposition to Brixmor Property Group Inc.'s ("Brixmor" or the "Company") motion to quash one request in Mr. Carroll's Rule 17(c) subpoena—for emails Mr. Carroll sent and received during the relevant time period.

These emails are a prime source of evidence on *mens rea*, which is likely to be a central issue in this case, because they will show what Mr. Carroll was doing and saying, the information he was receiving, and the extent to which he was relying on others on key issues in the case.  Indeed, Mr. Carroll's emails are so obviously central that it is surprising that Mr. Carroll has to resort to a Rule 17 subpoena to Brixmor to gather them.  Ordinarily, the government would have gathered these documents in its grand jury investigation and would have turned them over to Mr. Carroll during discovery under Rule 16.  It is only because the government failed to do so here that Mr. Carroll seeks these materials from Brixmor now.

That fact weighs heavily in favor of denying the motion to quash.  The government's failure to conduct an adequate investigation should not circumscribe the defendant's ability to gather the materials necessary to mount a defense.  (Otherwise, the government would have the incentive to investigate less.)  Rather, where the government fails to collect materials that it routinely produces under Rule 16, such as the defendant's own emails, the defense is entitled to take appropriate steps under Rule 17 to gather necessary materials.

Mr. Carroll's need for the documents is clear, and any burden on Brixmor is modest and manageable, and largely of its own making.  Mr. Carroll made repeated, diligent efforts to reach a compromise with Brixmor as to these document requests.  But Brixmor refused even to provide the basic information necessary to forge a compromise—the number of emails exchanged with various people and the number of emails hitting on various search terms.  Because the

1

defendant's own emails are routinely available to the defense in similar matters, and because Brixmor has refused to provide the basic information required to negotiate a compromise, the motion to quash should be denied.

**STATEMENT OF FACTS**

**I.    Background**

Mr. Carroll was the Chief Executive Officer ("CEO") of Brixmor, a real estate investment trust ("REIT").  The government alleges that Mr. Carroll, a non-accountant, and his co-defendant, Michael Pappagallo, conspired with two members of Brixmor's accounting team to "smooth" same-store net operating income ("SS-NOI"), a non-GAAP metric.

The government's investigation relied heavily on a five-week internal investigation conducted by Brixmor's Audit Committee (the "Audit Committee"), and a limited follow-up investigation conducted by the Securities and Exchange Commission ("SEC").  The SEC gathered largely the same documents reviewed by counsel for the Audit Committee, Sullivan & Cromwell ("S&C"), supplemented by documents responsive to one-sided and selective search terms that fit its theory of liability.  *See* Sahni Decl., Ex. A (SDNY Letter dated Sept. 27, 2019) at 6 (requesting documents responsive to terms like "cookie jar," "smooth earnings," and "meet guidance").  The government essentially drafted in the wake of the SEC, making only a handful of narrow requests of its own, largely directed to Brixmor's accounting policies and the analyses of Brixmor's internal and forensic accounting auditors.

Both the SEC and the government chose not to collect basic documents, like Mr. Carroll's work calendars and email box.  And both chose not even to demand all of the information collected by S&C.  For example, S&C conducted interviews of fourteen individuals involved in Brixmor's accounting, finances, and real estate holdings.  The SEC and the

2

government declined to obtain interview summaries of *ten* of those fourteen witnesses.  The

failure to gather all interview summaries was all the more troubling given that the interview

summaries the government *did* obtain contained extensive exculpatory information.  *See* Sahni

Decl., Ex. B (Summary Notes of Mortimer Interviews, Dec. 12, 2016) at

USAO_SDNY_0001645 (noting that when Mr. Mortimer was asked "whether anyone senior to

him had been consulted" about certain allegedly improper accounting practices concerning

Brixmor's ledger, Mr. Mortimer "responded negative"); *id*. at USAO_SDNY_0001646 ("AW

asked whether MM [Michael Mortimer] was told he was expected to achieve guidance estimates.

MM said no."); *id*. at USAO_SDNY_0001648 (when asked if "anyone senior to [Mr. Mortimer]

had instructed anyone to hold over amounts for 2016," Mr. Mortimer responded, "not to his

knowledge"); Ex. C (Summary Notes of Splain Interviews, Dec. 12, 2016) at

USAO_SDNY_0001630 ("AW said allegation that 2617 account has been used to smooth out

earning as senior management needed in order to meet expectations and guidance.  AW asked if

accurate.  SS [Steven Splain] said no.").

## II.     The Rule 17 Subpoenas

To begin to fill the glaring gaps in the evidentiary record, in November 2019, Mr. Carroll

sought the issuance of three Rule 17(c) subpoenas directed to Brixmor, S&C, and Simpson

Thacher & Bartlett LLP.  The Court so-ordered all three subpoenas, and the subpoenas were

promptly served.

Mr. Carroll entered into discussions with all three entities and reached agreements as to

most subpoena items.  Only Brixmor moved to quash, and Brixmor's motion is limited to one

subpoena item: the request for Mr. Carroll's emails ("Request 1").  Request 1 would not have

been necessary had the government conducted an appropriately thorough investigation.  The

defendant's emails are typically the centerpiece of any white-collar investigation.  In the experience of counsel for Mr. Carroll, the government routinely gathers *all* the defendant's email for some relevant period, rather than relying on one-sided search terms.  Accordingly, there is usually no need for the defendant to resort to a Rule 17 subpoena to seek his own emails, which are instead produced pursuant to Rule 16.

Although Mr. Carroll should be entitled to have access to *all* of his emails, in an effort to reduce the burden on Brixmor, counsel for Mr. Carroll engaged counsel for Brixmor in several discussions in an effort to potentially narrow this request and to try to address any concerns about burden.  Brixmor's conduct thwarted those negotiations.

At the outset, Brixmor asserted that the email request was unduly burdensome, citing the expense of reviewing documents for privilege.  Mr. Carroll offered to enter into a clawback/screening and non-waiver agreement with Brixmor that would have permitted Brixmor to forgo most human privilege review.  But Brixmor persisted in its refusal to produce the documents.

Counsel for Mr. Carroll then asked for data that would facilitate narrowing the request. Counsel first requested that Brixmor provide the number of emails Mr. Carroll exchanged with each person with whom he communicated more than thirty times.  Such a list would identify individuals with whom Mr. Carroll exchanged only a modest number of emails, which could be produced with no real burden.  And it would also identify those individuals with whom Mr. Carroll had more extensive communications, where search terms (although difficult to craft in this context) might be appropriate.  Such a report is simple and inexpensive to prepare, because the systems used to store emails in litigation can produce such reports automatically.  Brixmor refused.  Counsel for Mr. Carroll then provided counsel for Brixmor with the names of

individuals with whom Mr. Carroll likely had only limited communications and asked for the number of emails exchanged with those individuals.  Counsel also provided a list of potential search terms and asked only for the number of hits on each term.  These requests were not for documents, but solely for information that would allow Mr. Carroll to narrow his request.  Again, this data can be gathered automatically and inexpensively.  Brixmor nonetheless refused.

Instead, Brixmor filed a motion to quash Request 1.  In the motion, Brixmor has not attempted to document the burden it allegedly faces, beyond noting the total number of emails in Mr. Carroll's email box for the relevant time period.  The motion does not mention Mr. Carroll's offer to enter into an agreement that would obviate the need for most human privilege review, much less explain why that agreement does not alleviate entirely the alleged burden. Mr. Carroll respectfully requests that the Court deny Brixmor's motion to quash and compel Brixmor to produce "[a]ll Documents and Communications contained in Michael Carroll's Brixmor e-mail account, including, but not limited to all attachments to any Communications, sent or received during the Relevant Period."  *See* Buehler Decl., Ex. 1 (Brixmor Subpoena, Request No. 1).

## ARGUMENT

The documents Mr. Carroll seeks are necessary to fill the many gaps in the evidentiary record left by the government's incomplete investigation.  The motion to quash should be denied.

## I.    Legal Standard

The Sixth Amendment guarantees that "the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."  U.S. CONST. amend. VI.  Federal Rule of Criminal Procedure 17(c) implements that guarantee, permitting a party to request the production in advance of trial of, among other things, "books, papers, documents, data, or other

objects the subpoena designates." Fed. R. Crim. P. 17(c)(1). *See also United States v. Nixon*, 418 U.S. 683, 698-99, 711 (1974) (observing that the "chief innovation [of Rule 17(c)] was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials").

Courts generally review Rule 17 subpoenas for "(1) relevancy; (2) admissibility; [and] (3) specificity," and quash subpoenas only if compliance would be "unreasonable or oppressive." *Nixon*, 418 U.S. at 698, 700 (internal quotation marks omitted). *See also United States v. Stein*, 488 F. Supp. 2d 350, 366 (S.D.N.Y. 2007) ("The text of Rule 17(c) alone strongly suggests the conclusion that the subpoena should be enforced unless compliance would be unreasonable or oppressive."); *United States v. Nachamie*, 91 F. Supp. 2d 552, 562 (S.D.N.Y. 2000) ("The text of Rule 17(c) provides that '[t]he court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive.' Fed. R. Cr. P. 17(c). The Rule itself provides no other basis to quash a subpoena.") (alteration in original). Courts permit Rule 17 subpoenas when the requests are "reasonably targeted to ensure the production of material evidence." *United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008). As explained in detail below, Request 1, which Brixmor challenges, plainly meets the *Nixon* standard.

Several courts in this circuit have recognized that there is a "real question . . . as to whether it makes sense to require a defendant's use of Rule 17(c) to obtain material from a non-party to meet" the *Nixon* standard. *Nachamie*, 91 F. Supp. 2d at 562. Although we recognize that this Court has applied *Nixon* in this context, *see United States v. Binday*, 12 Cr. 00152 (CM), 2013 WL 4494659, at *1 (S.D.N.Y. Aug. 15, 2013), and we believe that Request 1 easily meets the *Nixon* standard, we respectfully preserve the argument that *Nixon* is not the correct standard for evaluating subpoenas served by a defendant. *See Stein*, 488 F. Supp. 2d at 365 (declining to

apply *Nixon* to quash a defendant's subpoena).  Instead, the proper standard is whether a

subpoena is "(1) reasonable, construed using the general discovery notion of material to the

defense; and (2) not unduly oppressive for the producing party to respond."  *Nachamie*, 91 F.

Supp. 2d at 563 (internal quotation marks omitted); *see also United States v. Nosal*, 291 F.R.D.

403, 409 (N.D. Cal. 2013) (applying *Nachamie* standard in assessing defendant's Rule 17(c)

subpoena to third party).

　　　This more lenient threshold for Rule 17 subpoenas served by defendants on third parties

carries out the Rule's "purpose of establishing a more liberal policy for the production,

inspection and use of materials at the trial," since Rule 17 was not intended "to exclude from the

reach of process of the defendant any material that . . . could be used at the trial."  *United States*

*v. Rajaratnam*, 753 F. Supp. 2d 317, 320 n.1 (S.D.N.Y. 2011) (alteration in original) (internal

quotation marks omitted) (quoting *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221

(1951)).  "It is extraordinarily difficult for a defendant, who has limited ability to investigate, to

know enough about the discovery he is seeking such that he can comply with the *Nixon*

requirements."  *Id*. (citation omitted).  Applying a "materiality standard" would ensure "that the

defendant has a right to obtain evidentiary material from a third party that is no broader—but

also no narrower—than the defendant's right to obtain such material from the government" and

"would resolve that puzzle at great benefit to the rights of defendants to compulsory process and

at little cost to the enforcement of the criminal law, since Rule 17(c) permits the government to

issue subpoenas as well."  *Id*. (citing Fed. R. Crim. P. 16(a)(1)(E)); *see also id*. (noting that "it

remains ironic that a defendant in a breach of contract case can call on the power of the courts to

compel third-parties to produce any documents 'reasonably calculated to lead to the discovery of

admissible evidence,' Fed. R. Civ. P. 26(b)(1), while a defendant on trial for his life or liberty

does not even have the right to obtain documents 'material to his defense' from those same third-parties").

## II.     The Challenged Request is Proper Under *Nixon*

### A.     Request 1 Targets Relevant Evidence

Brixmor argues that the requested documents are largely irrelevant.  To the contrary, the requested documents are crucial to the defense of this case, for multiple reasons.

*First*, the government's case is largely built on a very limited subset of his emails.  The government's investigation gathered only approximately 12,000—or less than 3% of the emails Mr. Carroll sent and received (after excluding the more than 800 emails included in the production from a *different* Michael Carroll).  The vast majority of the produced emails have missing or incomplete metadata, and many are simply emails to Mr. Carroll to which he did not respond.  *See, e.g.*, Ind. ¶¶ 23, 32.b (citing emails sent to Mr. Carroll to which he did not reply).  The jury will need to evaluate the likelihood that Mr. Carroll even read these emails, and whether, if he did so, he (a non-accountant) would have understood them and shared the government's interpretation of them.  To assist the jury in that task, the defense needs to be able to contrast Mr. Carroll's level of engagement with the emails the government relies on with his level of engagement on issues within his areas of expertise and responsibility, including leasing and operations, and to demonstrate the modest portion of Mr. Carroll's overall time and activity that was spent on accounting-related tasks.

All of this requires access to Mr. Carroll's emails on topics beyond the narrow set gathered by the government.  Surely, if Mr. Carroll regularly replied with substance and detail on other topics, but barely engaged in the emails the government relies upon, a jury could find that weighs against Mr. Carroll having the alleged culpable mental state.  But there is no way for Mr.

Carroll to demonstrate a contrast between his interaction with the government's emails and emails on other topics without access to his full set of emails.

*Second*, there are many topics—not easily defined by search terms—on which Mr. Carroll believes significant exculpatory evidence will be found in his emails.  Without access to the full set of emails, Mr. Carroll will not be able to present this evidence to the jury.

A few examples illustrate the point.  The government alleges that Mr. Carroll would have understood email references to "boosts" to have a nefarious meaning.  Ind. ¶ 23.  But that is not the case.  As the government conceded in one of its belated disclosures pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), witnesses told the government during its investigation that "boost" was a term that was commonly used as part of the projection process.  *See* Sahni Decl., Ex. D (Summary Notes of Yolande LeClerc Interview, July 13, 2017) at USAO_SDNY_0001690.  Indeed, during the relevant period, Brixmor was engaged in a Common Area Maintenance ("CAM") Reconciliation Project, a massive, years-long lease-by-lease review to identify and collect common area fees that Brixmor had failed to bill tenants. The purpose of this project, which commenced in 2012—before Brixmor went public—was to collect fees from tenants and ensure proper billing procedures going forward, in order to increase Brixmor's income.  Communications related to the CAM Project are necessary to explain why someone in Mr. Carroll's position would reasonably have understood email references to "boosts" to refer to legitimate funds from things like the CAM Project, not illicit accounting practices.  Emails related to the CAM Project will also illuminate how Brixmor was accounting for and applying funds from the inception of that project.  But the government's search terms would not capture all such documents.  Nor is it easy to identify an alternative set of search terms that will do so, since the phrasing of relevant information could vary greatly across a wide range

of topics relating to expenses at more than five hundred different properties that could potentially relate to the CAM Project.

The government has also put in issue potentially thousands of accounting entries. That is because SS-NOI is calculated based on certain property revenues and direct property operating expenses, and thus may be affected by accounting entries that involve a property's revenue or operating expenses, including rent, taxes, maintenance fees, and recoveries from other tenants. Brixmor had over 500 different properties, generally retail shopping centers with multiple tenants, each with differing lease and payment terms. Emails with Mr. Carroll about *any* of these properties (or any of their tenants) could shed light on a disputed income or expense item related to the property, which could affect SS-NOI. Limited search terms will not identify all such emails.

The government is also challenging the characterization of income associated with settlements related to more than fifty properties. Mr. Carroll's email communications would evidence, among other things, that he had reason to understand that legal counsel was involved in ensuring that Brixmor's settlements with tenants were appropriately documented, and supported the proper accounting treatment of such settlements. Again, the government's search terms do not begin to capture all such documents. The only reliable way to do so (given the large number of properties involved) is to collect Mr. Carroll's emails in the relevant period. Moreover, the government has not provided the underlying settlement agreements for many relevant properties. Mr. Carroll's emails may contain the specific agreements for each of the transactions at issue.

More generally, a central defense in this case is Mr. Carroll's good-faith reliance on his accounting team. Emails with that team—even on topics not related to SS-NOI—would

demonstrate a *practice* of relying on accountants in good faith and the jury would be entitled to conclude that Mr. Carroll followed that practice with regard to SS-NOI. The jury will also need to understand the importance of accounting metrics other than SS-NOI to evaluate the government's case on materiality. And understanding Brixmor's practices with respect to other accounting metrics will be important to evaluating whether practices for SS-NOI departed from the norm. Again, given the varied subject matter of emails that could contain such evidence, search terms alone are not likely to suffice for identifying all relevant emails.

Put simply: Mr. Carroll's emails are critical evidence that will support central defenses, and there is no realistic way to identify the most pertinent emails without collecting all of them.

### B. Request 1 Seeks Admissible Evidence

Request 1 is targeted at admissible evidence. Because it "will often be difficult at the pretrial stage to determine with precision the admissibility of certain documents . . . if a document is arguably relevant and admissible under the Rules of Evidence, the *Nixon* 'evidentiary' requirement is likely satisfied." *United States v. Libby*, 432 F. Supp. 2d 26, 31 (D.D.C. 2006); *see also Rajaratnam*, 753 F. Supp. at 320 n.1 (suggesting that material sought is "presumptively admissible" where subpoena proponent demonstrated its likely relevance); *United States v. Bergstein*, 16 Cr. 00746 (PKC), 2018 WL 9539846, at *2-*3 (S.D.N.Y. Jan. 24, 2018) ("[Defendant] argues that these records are relevant to the issues of intent, materiality, and loss within the meaning of Rule 401 . . . . The Court determines that [defendant's] showing permits a rational inference as to the relevance of these materials and sufficiently preliminarily demonstrates admissibility."). As explained above, Mr. Carroll expects that the requested documents will be admissible because they are relevant—indeed, critical—to questions of intent. Mr. Carroll expects that the requested communications will likely be admissible as records made

in the regular course of business.  *See* Fed. R. Evid. 803(6)(B).  Therefore, Request 1 satisfies *Nixon*'s admissibility requirement.

### C.    Request 1 Specifically Identifies the Requested Material

In order to satisfy *Nixon*'s specificity requirement, the party seeking production of the materials must "reasonably specify the information contained or believed to be contained in the documents sought" rather than merely hope that something useful will turn up.  *United States v. Sawinski*, No. 00 Cr. 00499 (RPP), 2000 WL 1702032, at *2 (S.D.N.Y. Nov. 14, 2000) (quotations omitted).  A subpoena meets these specificity requirements if the defendant is able to specify what he believes to be contained in the documents he seeks.  *Id*.  However, the proponent of a subpoena "need not have prior knowledge of specific documents to meet the specificity requirement of Rule 17(c)."  *United States v. Weisberg*, 08 Cr. 00347 (NGG), 2011 WL 1327689, at *7 (E.D.N.Y. Apr. 5, 2011).  This is because, "in the context of a subpoena to a third party . . . , requiring the defendant to specify precisely the documents he wants without knowing what they are borders on rendering Rule 17 a nullity."  *Rajaratnam*, 753 F. Supp. at 320 n.1.  It is enough that the request be "sufficiently narrowly focused on a group of records likely to contain helpful documents," such that the subpoena proponent "cannot be said to be engaging in a 'fishing expedition.'"  *Weisberg*, 2011 WL 1327689, at *7 (quoting *In re Irving*, 600 F.2d 1027, 1034 (2d Cir. 1979)).

That is the case here.  Request 1 seeks a discrete and specific set of communications from a critical time frame.  The communications sought are readily identifiable and available documents, *i.e.*, the emails Mr. Carroll sent and received.  Moreover, Request 1 includes a finite date range, from January 1, 2011 through the end of Mr. Carroll's employment at Brixmor,

February 7, 2016.[1]  This period is directly linked to the period surrounding the dates of the

alleged conspiracy.  Brixmor suggests the time period is overbroad because it predates the IPO,

when the conspiracy is alleged to have begun. But there is good reason for Mr. Carroll's request

for pre-IPO documents.  The SEC has alleged that the relevant practices began before the IPO.

*See SEC v. Carroll*, 19 Civ. 7199, Am. Compl. ¶ 37 ("Defendants used an internal books and

records account, the "2617 Account," which Splain, Mortimer and others referred to internally as

a "cookie jar," to improperly alter the timing of revenue recognition.  In doing so, *Defendants*

*continued a practice that Carroll had instituted even prior to Brixmor's IPO* to manipulate the

timing of recognizing certain income items to achieve desired SP NOI Growth Rates." (emphasis

added)).  To the extent that is true, it is exculpatory, not incriminating, for these practices cannot

have been intended to defraud public shareholders (as the indictment alleges) if they were

developed at a time when Brixmor did not have public shareholders.  But the SEC's allegations

make clear that events prior to the IPO are potentially relevant and a proper subject of this

subpoena.

       While a request for "all documents and communications" might appear overbroad in

many instances, that is not the case here.  As explained above, Mr. Carroll is forced to seek his

own emails through a Rule 17(c) subpoena because the government only reviewed a narrow

subset of his communications, largely written by other people, that were responsive to selective

and one-sided search terms.  Its theory of liability, therefore, is based on a curated, slanted

collection of documents that have been stripped of their context.  Request 1 may sweep broadly,

---

[1]  Mr. Carroll resigned from Brixmor on February 7, 2016.  The Brixmor Subpoena defines the
relevant period as January 1, 2011, through December 31, 2016.  However, Mr. Carroll agrees
that for purposes of Request 1, the relevant date range ends February 7, 2016, the date on which
his employment at Brixmor ended.

but that is necessary given the nature of the charges and the evidence relied upon.  Requiring

more specificity from the defense in these circumstances would improperly reward the

government for not conducting an appropriately thorough investigation.

> ### D.      The Requested Documents Are Not Available from Any Other Source

As noted above, Brixmor produced to the government, and the government produced in

discovery, fewer than 3% of Mr. Carroll's emails.  Request 1 therefore almost entirely seeks

evidence that the government has not produced to Mr. Carroll and that is not "otherwise

procurable reasonably in advance of trial by exercise of due diligence."  *Nixon*, 418 U.S. at 699.

Referring to its circumscribed email production to the government, Brixmor asserts that it

already produced "much of the relevant material" sought by Mr. Carroll, and that Mr. Carroll

should "not be permitted to use Rule 17(c) to seek materials that [he] ha[s] already obtained from

the government."  Brixmor Mem. in Support of Mot. to Quash at 14, Dec. 6, 2019, ECF No. 36.

Mr. Carroll does not require Brixmor to reproduce the 3% of his emails already produced to the

government, so long as Brixmor's original production included appropriate metadata.  But to the

extent Brixmor's original productions did not include metadata, it is appropriate to require that

the materials be reproduced, as metadata may be pertinent.  And there is no dispute that the vast

majority of what is sought here—more than 97%—was *not* produced previously and is not

otherwise attainable.

> ## III.    The Burden to Brixmor Does Not Justify Quashing the Subpoena

Finally, Brixmor argues that compliance with Request 1 would be unduly burdensome

because the documents are voluminous.  But a subpoenaed entity "cannot evade its discovery

responsibilities by simply intoning . . . that the disclosure sought would be burdensome,

oppressive, or overly broad."  *Stein*, 488 F. Supp. 2d at 368 (internal alterations omitted)

(quoting *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 42 (S.D.N.Y.1984)).  Nor can an entity establish that compliance with a subpoena would be overly burdensome merely by offering a declaration attesting to a large quantity of potentially responsive material.  *See id*. (holding that movant failed to establish burden where "entire showing" on issue was "a declaration of counsel . . . stat[ing] . . . [that] counsel possess over 1000 boxes of documents as well as numerous gigabytes of electronic data potentially responsive to the Subpoena request").

Moreover, Brixmor refuses even to engage in good-faith negotiations over Request 1.  Brixmor altogether fails to mention that counsel for Mr. Carroll made numerous efforts to alleviate the purported burden on Brixmor by narrowing Request 1.  Brixmor refused to provide information necessary to reach a compromise.

Brixmor has maintained that compliance with Request 1 would be unduly burdensome because the documents are voluminous.  This contention is unavailing.  Mr. Carroll's emails will not be difficult to collect.  Brixmor does not need to retrieve documents from an archive or sift through hard copies.  Given that the emails are stored electronically, production is straightforward and automated.  Brixmor's chief argument with respect to burden stems from its desire to review each of Mr. Carroll's emails before producing them.  Specifically, Brixmor argues that it would be burdensome to review each responsive document for privilege.  For one, concerns about privilege are misplaced in light of the fact that Request 1 is for only Mr. Carroll's *own* emails, *i.e.*, documents to which he by definition already had access.  In any event, Mr. Carroll made clear he would agree to a clawback and screening agreement that would obviate the need for almost all manual privilege review.  Yet Brixmor still refused to comply with Request 1—or indeed, to respond to Mr. Carroll's other reasonable offers of accommodation.  Brixmor

should not be permitted to cry burden when it has rejected the very offers that would dramatically lessen its purported burden.[2]

Brixmor, having summarily rejected Mr. Carroll's good faith attempts to reach a reasonable accommodation, should not be permitted to undermine Mr. Carroll's constitutional right to obtain the evidence he needs to defend himself at trial.

## CONCLUSION

For the foregoing reasons, Mr. Carroll respectfully requests that this Court deny Brixmor's motion to quash Request 1.

Dated:  New York, New York
       December 13, 2019

Respectfully submitted,

/s/ Peter G. Neiman
PETER G. NEIMAN
ANJAN SAHNI
MICHELLE NICOLE DIAMOND
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

---

[2] To the extent that Brixmor wishes to review documents for purposes other than privilege, that is a burden for which Brixmor is volunteering unnecessarily; it need not do so to comply with the subpoena.  Moreover, any claim by Brixmor that it needs to review Mr. Carroll's emails for such purposes is dubious.  The requested emails are by this point between three and eight years old and to our knowledge Brixmor has no ongoing investigation or litigation related to these events. And Mr. Carroll is, of course, willing to enter into an appropriate protective order in the unlikely event that any of the information sought remains competitively sensitive.

WILLIAM R. MCLUCAS
BRENDA E. LEE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

*Counsel for Michael Carroll*