**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

MICHAEL CARROLL and
MICHAEL PAPPAGALLO,

Defendants.

)
)
)
)
)
)
)
)
)
)

No. 19-cr-545 (CM)


**MEMORANDUM OF LAW IN SUPPORT OF MICHAEL CARROLL'S**
**MOTION FOR A BILL OF PARTICULARS**

# TABLE OF CONTENTS

Introduction ..................................................................................................................... 1

Argument ......................................................................................................................... 6

   I.     The Government Should Be Required To Identify The Accounting Entries It Believes Were Unlawful ......................................................................................... 7

      A.     The Indictment Does Not Purport To Identify All Allegedly Fraudulent Accounting Entries .............................................................................. 7

      B.     The Accounting Workpapers Do Not Cure The Indictment's Lack Of Specificity ...................................................................................... 12

           1.     The summary spreadsheets do not identify all the accounting entries at issue .......................................................................... 12

           2.     There is no meaningful way to determine whether the workpapers supply the missing information ........................................................... 14

           3.     The summary spreadsheets are over-inclusive ......................................... 14

           4.     Neither the workpapers nor the summary spreadsheets address accounting entries that were considered but not made .................................. 15

   II.     The Government Should Be Required To Identify, Well In Advance of Trial, The Accounting Entries It Intends To Present At Trial ................................................... 17

Conclusion ..................................................................................................................... 17

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*United States v. Bortnovsky*,
   820 F.2d 572 (2d Cir. 1987)............................................................................7, 10

*United States v. Connolly*,
   No. S1 16 Cr. 370 (CM), 2017 WL 253788 (S.D.N.Y. May 24, 2017) ........................6, 7, 10

*United States v. Contorinis*,
   No. 09 Cr. 1083 (RJS), 2010 U.S. Dist. LEXIS 74739 (S.D.N.Y. May 5, 2010) ....................9

*United States v. Ghavami*,
   No. 10 Cr. 1217 (KMW), 2012 WL 2878126 (S.D.N.Y. July 13, 2012) ...............................11

*United States v. Gupta*,
   No. 11 Cr. 907 (JSR), 2012 WL 1066804 (S.D.N.Y. Mar. 27, 2012) ....................................11

*United States v. Kahale*,
   789 F. Supp. 2d 359 (E.D.N.Y. 2009) .......................................................................8

*United States v. Mahaffy*,
   446 F. Supp. 2d 115 (E.D.N.Y. 2006) ...............................................................11, 15

*United States v. Nachamie*,
   91 F. Supp. 2d 565 (S.D.N.Y. 2000)........................................................................8, 10

*United States v. Rajaratnam*,
   No. 09 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ............................8, 16

*United States v. Savin*,
   No. 00 Cr. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001)....................................6, 11

*United States v. Vaid*,
   No. 16 Cr. 763 (LGS), 2017 WL 3891695 (S.D.N.Y. Sept. 5, 2017)................................7, 11

*United States v. Walters*,
   No. 16 Cr. 338 (PKC) (S.D.N.Y. Dec. 13, 2016) ....................................................8

**Rules**

Federal Rule of Criminal Procedure 7(f) .......................................................................1

**Constitutional Provisions**

U.S. Const., Amend. VI ...............................................................................................6

Defendant Michael Carroll respectfully submits this memorandum of law in support of his motion to compel the government to provide a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f).

## INTRODUCTION

The government has charged Mr. Carroll with participating in a decidedly unusual accounting fraud.  There is no claim that Brixmor Property Group Inc. ("Brixmor") recognized any income it did not really earn.  Nor does the government claim error in any of the dozens of numbers that Brixmor was required to report in its financial statements under Generally Accepted Accounting Principles ("GAAP") or in any of the other non-GAAP measures that Brixmor reported.  Instead, the government's theory focuses on a metric Brixmor was *not* required to report at all, that was not governed by GAAP, and that has no industry-standard method of calculation.  And with regard to that metric—same-store net operating income ("SS-NOI")—the government's theory has to do with *timing*, not substance.  That is, the government alleges that Brixmor "smoothed" its quarterly SS-NOI results—which Brixmor did not provide guidance on—so that the SS-NOI for each *quarter* within the year was within the guidance range that Brixmor had publicly forecasted for *annual* SS-NOI.[1]  But Brixmor's *annual* performance essentially matched its *annual* forecasts, with or without the alleged quarter-to-quarter smoothing.

SS-NOI is "a non-GAAP measure often used by real estate companies as a supplemental measure of operating performance."  Declaration of Michelle Nicole Diamond in Support of

---

[1] Throughout the relevant period, Brixmor experienced positive SS-NOI growth (as well as positive growth trends in a variety of other metrics that real estate investment trusts use to measure performance, including funds from operations, total revenue, cash flow, dividends, and leasing-related metrics).  Investors thus had a strong basis for believing Brixmor's consistent, positive growth, separate and apart from any alleged (and immaterial) smoothing of SS-NOI.

Michael Carroll's Motion for a Bill of Particulars ("Diamond Decl."), Ex. A (Brixmor Property Group Inc., Amendment No. 1 to Form S-11, dated Aug. 23, 2013) at iii.  Brixmor's management "use[d] [SS-NOI] to review [] operating results for comparative purposes with respect to previous periods or forecasts, and also to evaluate future prospects." *Id.* at 21. Brixmor publicly disclosed its SS-NOI but also cautioned investors that SS-NOI "is not intended to be a performance measure that should be regarded as an alternative to, or more meaningful than, [] GAAP financial measures." *Id.*  It also explained that non-GAAP measures like SS-NOI "have limitations as they do not include all items of income and expense that affect [] operations," and that its "computation of [SS-NOI] may differ from similarly titled measures reported by other companies and, therefore, may not be comparable to such other companies." *Id.*

At a high level of generality, SS-NOI is rental income less rental expenses for a designated set of properties owned both in the current and the prior-year reporting period.  But there are many categories of income and expense potentially considered as included (or not included) within SS-NOI as a matter of business judgment (*e.g.*, tenant reimbursements for maintenance of common areas or general and administrative expenses).  Across real estate investment trusts ("REITs"), practices vary widely as to which properties, and which income and expense items, are included in SS-NOI—some are publicly disclosed, and some are not. Diamond Decl., Ex. B (Green Street Advisors Report on Strip Center Sector, dated Sept. 16, 2013) at WB00363420 (noting that some REITs include redevelopment properties in SS-NOI, and some do not; some REITs include bad debt expenses, and some do not; some REITs include prior-year expense recoveries, and some do not).  At Brixmor, approximately 500 different properties (retail shopping centers, with multiple tenants, each with differing leases and payment

2

terms) were typically in the same-store pool, and quarterly SS-NOI totaled in the hundreds of millions of dollars. Each quarter's SS-NOI at Brixmor was thus the result of many thousands of routine accounting decisions about how much in expenses and revenues to recognize from various events related to each property and to each tenant at each property, when to recognize those expenses and revenues, whether the particular expense and revenue items were the appropriate *kind* to count in SS-NOI, and whether each accounting line item should be included in a property-level account (which typically would affect SS-NOI) or a corporate-level account (which typically would not).

The government's theory is that some of those accounting decisions were made fraudulently. But even on the government's theory, the vast majority were not. The net amount of the alleged fraud in each quarter is miniscule—at most 1.29% of quarterly SS-NOI. *See* Memorandum of Law in Support of Michael Carroll's Motion to Dismiss the Indictment at 5 (listing alleged adjustment in Q4 2013 of $2,497,347); Brixmor Property Group Inc., Form 8-K (Feb. 19, 2014) at 37 (reporting Q4 2013 SS-NOI of $193,999,000). And in certain instances, the allegedly fraudulent accounting entries were as small as $1.48—in a company with total assets ranging from $9.4 to $10 *billion* during the period at issue. *See infra* at 14. The Indictment does not identify *all* the entries that allegedly contributed to the fraud, leaving the defense to guess at which of the many thousands of entries that make up each quarter's SS-NOI the government contends were made with criminal intent.

That is not a problem that can await trial to repair. Countering the government's contention that a particular income or expense item should have been included (or excluded) in SS-NOI for one period or another requires knowing myriad details about the specific income or expense item and the specific property to which the item relates. The government's three

principal theories are prime examples.  Understanding Brixmor's use of the "other income" or 2617 account (Indictment ("Ind.") ¶¶ 22-28, ECF No. 2) requires examining the account's sub-ledger line items related to real estate taxes, late fees, tenant credits, and tenant deposit reconciliations, which are not broken out in the Indictment.  To evaluate Brixmor's accounting of what the government characterizes as lease settlement income ("LSI") (*id.* ¶ 29), Mr. Carroll must analyze the lease agreement and any related settlement agreement for each property at issue to determine the nature of the payment and when to properly recognize the income based on the particularities of the property and the agreement.  And determining whether a property should or should not have been included in SS-NOI (*id.* ¶¶ 30-32) requires examining the nature of the property, whether a partial sale occurred, any prior period billing anomalies, any redevelopment projects that might be underway at the property, and the scope and timing of those projects. Compiling and evaluating all of this information takes time and cannot feasibly be done unless Mr. Carroll knows, now, the specific accounting entries that are at issue.

The Indictment also alleges that Brixmor *considered* making other accounting entries related to SS-NOI; that had they done so, the entries would have been fraudulent; and that the discussions of these entries were overt acts in furtherance of the charged conspiracy.  *Id.* ¶¶ 32(b), 32(d).  But the Indictment does not identify all such purportedly considered entries. Again, Mr. Carroll cannot adequately prepare to rebut the claim that a *considered* entry would have been fraudulent if made without having ample time in advance of trial to investigate the details of the allegedly considered entry.

Mr. Carroll therefore asked the government to provide a bill of particulars identifying (1) the specific entries the government contends were fraudulent, and (2) each *considered* entry the government contends would have been fraudulent if made.  *See* Diamond Decl., Ex. C

4

(Carroll Letter to S.D.N.Y., dated Aug. 27, 2019) at 4.  The government refused, instead
directing Mr. Carroll to a nested set of nine spreadsheets, *see id.*, Ex. D (Marks Paneth "Final"
Workpapers) (the "summary spreadsheets") at 1 (Summary of Adjustments to Same Property
NOI), and approximately 6,000 pages and 300 spreadsheets of associated workpapers from two
different forensic accounting firms.  Mr. Carroll reiterated his request for a bill of particulars on
October 3 and 15, 2019.  *See id.*, Ex. E (Carroll Letter to S.D.N.Y., dated Oct. 3, 2019) at 3-4;
*id.*, Ex. F (Carroll Letter to S.D.N.Y., dated Oct. 15, 2019) at 6 n.1.  The government has
continued to refuse.  *Id.*, Ex. G (S.D.N.Y. Letter to Carroll, dated Oct. 16, 2019) at 3.

       The materials identified by the government do not solve the problem for multiple reasons.
*First*, the summary spreadsheets do *not* identify all the accounting entries at issue.  Many
numbers are simply presented in aggregate, without all the individual entries that add up to the
aggregate amount.  Indeed, some of the specific examples alleged in the Indictment do not
appear to be reflected as standalone items in the summary spreadsheets.  *Second*, there is no
obvious way to determine whether the backup workpapers supply the missing information (*i.e.*,
the specific entries that make up various aggregate numbers) or include the specific
documentation that the company used to make those determinations.  The backup workpapers
include *300* voluminous spreadsheets that reference tens of thousands of different accounting
entries, but they do not indicate whether each entry in each spreadsheet is alleged to be
fraudulent and do not explain how each spreadsheet within the backup workpapers is tied to the
summary spreadsheets.  *Third*, the summary spreadsheets also appear to be over-inclusive:  They
include, in nearly every quarter, accounting entries that the government could not possibly be
alleging were fraudulent and that appear to be minor errors in computation or classification.  But
based on the way the government has presented the summary spreadsheets, it is impossible to

decipher which transactions the government alleges were part of an illegal securities fraud and which entries were inconsequential errors. *Fourth*, neither the summary spreadsheets nor the backup workpapers addresses in any way the entries that were considered but not made.

The government should therefore be required to provide a bill of particulars identifying (1) all actually made accounting entries alleged to be fraudulent or improper, and (2) all accounting entries the government contends were considered by the conspirators and would have been fraudulent if made. Such a bill of particulars appears likely to include many more entries than the government could possibly plan to prove at trial. So that the defense does not waste significant resources running down every last detail of entries the government (a) contends are fraudulent, but (b) does not plan to introduce at trial, the government should be required (in addition to providing a bill of particulars now) to identify well in advance of trial the particular entries within the bill of particulars that it intends to present at trial to explain the alleged scheme to the jury.

## ARGUMENT

A bill of particulars is necessary to inform Mr. Carroll "of the nature and cause of the accusation[s]" against him, U.S. Const., amend. VI, and to "advise him of the specific acts of which he is accused," *United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533, at *2 (S.D.N.Y. Mar. 7, 2001). Without a bill of particulars, Mr. Carroll will be unable to "prepare a defense, to avoid unfair surprise at trial, and to preclude a second prosecution for the same offense." *United States v. Connolly*, No. S1 16 Cr. 370 (CM), 2017 WL 2537808, at *1 (S.D.N.Y. May 24, 2017) (citing Fed. R. Crim. P. 7(f)). The government began its investigation well over three years ago and has had the benefit of many debriefings of two cooperating witnesses (Mr. Splain and Mr. Mortimer), both accountants who have pled guilty to the alleged fraud. It knows by now which accounting decisions and discussions it believes were fraudulent

and which of those it will use as evidence of the alleged conspiracy at trial. The government should be directed to provide that information to Mr. Carroll to allow him time to prepare his defense.

**I.     The Government Should Be Required To Identify The Accounting Entries It Believes Were Unlawful**

**A.     The Indictment Does Not Purport To Identify All Allegedly Fraudulent Accounting Entries**

Where, as here, the government has alleged transaction-based fraud, courts have repeatedly directed the government to provide a bill of particulars. *See, e.g.*, *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) ("In cases involving fraud, courts have required the Government to specify through a bill of particulars which document or transactions to prove are fraudulent if this information is not ascertainable."). The Indictment highlights the need for a similar order here: It does not provide sufficient information to allow Mr. Carroll to identify which of Brixmor's thousands of accounting entries the government believes were unlawful—let alone which accounting discussions the government will contend would have been fraudulent if made, or which accounting entries the government will actually rely on at trial.

Fraud charges (like those here) often warrant a bill of particulars. "[O]therwise, in effect, 'the burden of proof impermissibly may shift' to the defendant to prove the documents or transactions are not fraudulent." *United States v. Vaid*, No. 16 Cr. 763 (LGS), 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017) (alterations omitted) (quoting *Bortnovsky*, 820 F.2d at 575). Likewise, in transaction-based cases, courts in this Circuit have frequently ordered the government to provide a bill of particulars identifying the specific transactions, entries, or decisions that it will contend were unlawful at trial. *See, e.g.*, *Connolly*, 2017 WL 2537808, at *6 (directing the government to "identify[] to the defense a finite universe of trades, from which it will . . . choose a still smaller number of trades [at trial] in order to explain the scheme to the

7

jury"); Transcript of Proceedings at 27:1-28:4, *United States v. Walters*, No. 16 Cr. 338 (PKC) (S.D.N.Y. Dec. 13, 2016), ECF No. 51 (ordering a bill of particulars that identified all trades allegedly made based on inside information that the government planned to offer in evidence at trial); *United States v. Nachamie*, 91 F. Supp. 2d 565, 574-75 (S.D.N.Y. 2000) (granting request for bill of particulars that identifies each document allegedly sent or received as part of the conspiracy and, for each document, "each item, statement or entry" on the document that "is alleged to be false or fraudulent").  Courts also frequently direct the government to produce a bill of particulars when "the acts which form the basis of the charges may outwardly appear to be legitimate business communications," as in those cases "there is a greater potential for confusion over what precisely the government intends to prove at trial."  *United States v. Kahale*, 789 F. Supp. 2d 359, 373 (E.D.N.Y. 2009).

It is thus precisely in cases like this one—fraud cases involving tens of thousands of decisions the government might believe were unlawful, and in which many of the documents produced by the government appear to be entirely legitimate business communications—that a bill of particulars is warranted and essential for the defense.  For example, courts have routinely ordered the government to produce a bill of particulars in insider trading cases, in which defendants must do a detailed assessment, for each trade at issue, of the alleged inside information, when the information became public, whether the information was material, and what benefit, if any, was conveyed.  Mr. Carroll cannot independently develop the facts necessary to disprove each and every one of the thousands of transactions that might form the basis of the government's case.  Courts recognize this and have routinely ordered the government to produce bills of particulars when that information was not included in the indictment.  *See, e.g.*, *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168,

at *2-5 (S.D.N.Y. July 13, 2010) (requiring the government to identify "all reporting periods that were the subject of inside information," "the substance of the information provided for any period," and "the date(s) on which it was conveyed," as well as "the target companies," "the identity of the tipper," and "which tipper provided which piece of information" for certain counts, even though the government had disclosed "the securities at issue in each count of the indictment," "the event to which each piece of inside information relates," and "the trades at issue in the substantive counts" because "the production of this material does not necessarily obviate the need for a bill of particulars"); *United States v. Contorinis*, No. 09 Cr. 1083 (RJS), 2010 U.S. Dist. LEXIS 74739, at *1 (S.D.N.Y. May 5, 2010) (directing the government to produce a "bill of particulars with respect to the material, non-public information allegedly disclosed in connection with [a specific] transaction").

A similar order is required here.  Much like insider trading cases, which involve thousands of facially similar transactions, this case involves thousands of apparently similar accounting entries.  Defending against the thousands of accounting entries discussed in the government's productions requires identifying and understanding all of the details of the accounting entries at issue, including why the payment was made, when it was made, whether it was subject to any contingencies, whether any special circumstances applied to the property at issue, who directed the accounting treatment that ultimately occurred, and whether the lease agreement, lease termination agreement, or any other contract relating to that property called for a specific accounting treatment.  Mr. Carroll cannot independently assess this information for each of the thousands of accounting line items that compise each quarter's SS-NOI.

The size of Brixmor's business and nature of calculating SS-NOI exacerbates the need for a bill of particulars.  SS-NOI is (at a high level of generality) calculated based on property

revenue and direct property operating expenses, and thus any accounting entries that affect a property's revenue or operating expenses—including base rent, expense reimbursements, general and administrative expenses, operating expenses, and taxes, among others—may potentially affect SS-NOI.  At all relevant times, Brixmor had over $9 billion in assets and nearly 500 properties in its same-store pool.  Brixmor thus made tens of thousands of accounting decisions relevant to SS-NOI and the charges against Mr. Carroll, and many of these entries relate to charges or credits that were incurred years ago.  Still other entries, such as common area maintenance recoveries or real estate tax recoveries, were projections based on assumed recovery rates.  The government's 95,000-document, 535,000-page production contains over 13,000 spreadsheets, many of which include references to thousands of different accounting decisions and discussions relevant to the government's allegations.  Yet the Indictment identifies fewer than a dozen "examples" of allegedly improper accounting entries.  *See* Ind. ¶ 23 (providing an "example" of the illicit storage of income).

Mr. Carroll cannot "identify with sufficient particularity" which of the many thousands of accounting entries Brixmor made each quarter that the government may contend were fraudulent—let alone identify which subset of those the government intends to rely on at trial. "Fundamental fairness demands that, in a case of this nature, and with this volume of potentially relevant data, the Government identify a manageable subset within the universe of data that is actually relevant to the courtroom presentation of this case."  *Connolly*, 2017 WL 2537808, at *5; *see also Bortnovsky*, 820 F.2d at 574 (ordering a bill of particulars when the government had produced "over 4,000 documents" during discovery but failed to disclose "the dates of the fake burglaries and the identity of the three fraudulent documents"); *Nachamie*, 91 F. Supp. 2d at 571 (ordering a bill of particulars where the government had produced "over 200,000 pieces of paper

in hundreds of boxes" "relating to 2,000 Medicare claims" but had "not indicated which of those documents it intend[ed] to rely on to present its case-in-chief at trial"). Without a bill of particulars, Mr. Carroll "will be forced . . . to guess which of the numerous transactions documented therein" were allegedly fraudulent or improper. *Savin*, 2001 WL 243533, at *3 (requiring bill of particulars where government had produced 100,000 pages of discovery); *see also Vaid*, 2017 WL 3891695, at *11 (requiring a bill of particulars because "[g]iving Defendants data and documents for over 500,000 claims but not specifying which ones it will seek to prove at trial were fraudulent does not enable Defendants to prepare for trial or prevent surprise").

When courts have declined to order bills of particulars in transaction-based cases, they typically rely on the government's prior disclosure of precisely the information Mr. Carroll seeks here: the specific entries or discussions that form the basis for the charges. *See, e.g.*, *United States v. Ghavami*, No. 10 Cr. 1217 (KMW), 2012 WL 2878126, at *3 (S.D.N.Y. July 13, 2012) (government had produced a "Draft BOP, in the form of a chart listing the 48 transactions that are, in aggregate, the subjects of the conspiracy and fraud charges," and subsequently informed defendants which transactions it was removing from that list); *United States v. Gupta*, No. 11 Cr. 907 (JSR), 2012 WL 1066804, at *3 (S.D.N.Y. Mar. 27, 2012) (indictment identified "most if not all" of the information sought, including the dates of the specific trades at issue); *United States v. Mahaffy*, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006) (indictment specified "the date, volume, price, and source of the allegedly unlawful transactions at issue"). The lack of this basic information here emphasizes the need for a bill of particulars.

B.      **The Accounting Workpapers Do Not Cure The Indictment's Lack Of Specificity**

The government has stated that a bill of particulars is not warranted here because it has produced "workpapers" from Marks Paneth and Alvarez & Marsal—two forensic accounting firms that analyzed Brixmor's accounting ledgers—that purportedly identify all allegedly fraudulent accounting entries, as well as a Marks Paneth spreadsheet (which is really several spreadsheets) that "summarizes" these entries. *See* Diamond Decl., Ex. H (S.D.N.Y. Letter to Carroll, dated Sept. 27, 2019) at 2-3. Those documents are not a substitute for a bill of particulars. They are both under-inclusive (in that they do not identify all the accounting entries at issue and are missing key information) and over-inclusive (in that they do not distinguish between accounting errors and alleged intentional fraud). Nor do they address in any way the entries that were considered but not made. A bill of particulars is therefore required.

1.      **The summary spreadsheets do not identify all the accounting entries at issue**

The government has represented that the "summary" spreadsheets describe "all" allegedly fraudulent entries. *See id*. That cannot be so—the spreadsheets do not even reference all of the entries alleged to be fraudulent in the Indictment. For example, the Indictment alleges that Brixmor manipulated SS-NOI by illicitly storing certain income in the 2617 account when it should have immediately recognized that income. *See* Ind. ¶¶ 22-28. The Indictment alleges that "Brixmor received an $81,000 common area maintenance fee ('CAM') from a tenant ('Tenant-1'), which should have been immediately recognized as income and been incorporated into the calculation of SS-NOI for that quarter." *Id*. ¶ 25. Nowhere in the summary spreadsheets is there a line entry for an $81,000 payment.

That is not the only entry that appears to be missing from the summary spreadsheets. In further support of the government's "cookie jar" theory, for example, the Indictment cites a

"Boost of $950,000" (or alternatively "900 k or so . . . as 'boost'") that was improperly included in Q3 2014. *Id.* ¶ 23. But there is no approximately $900,000 individual line item from the 2617 account referenced in the summary spreadsheets. Nor can Mr. Carroll surmise from review of this spreadsheet which combination of smaller line-item entries might comprise an adjustment of somewhere in the neighborhood of "900 k or so." *Id.* The same is true for "$263K of collected PYCM [(Prior Year CAM)]" allegedly saved for use in Q4 2015—the Indictment and the summary spreadsheets do not indicate which properties were involved in these payments or how they were broken out. *Id.* ¶ 27. Similarly, the spreadsheets indicate that the two largest adjustments took place in Q3 and Q4 of 2013. Mr. Carroll was advised during the internal investigation that these adjustments relate to the accounting treatment of duplicate or "unvouchered" purchase orders and a real-estate tax dispute, respectively, and that each adjustment aggregates over $1 million. And the impact of these outsized adjustments had a roll-forward effect on adjustments in other quarters. Yet neither the documents produced by the government, the summary spreadsheets, nor the workpapers provide sufficient information to understand any detail of these adjustments or their component accounting entries. There is no allegation that Mr. Carroll had any knowledge of the purchase order project or the accounting related to it, and the Indictment makes no reference to these two largest adjustments. Similarly, the summary spreadsheets contain only aggregate entries for certain issues (*e.g.*, security deposits and tenant credits), but does not break them down. Without a bill of particulars explaining which entries the government believes were fraudulent, Mr. Carroll is left unable to prepare his defense.

### 2.     There is no meaningful way to determine whether the workpapers supply the missing information

Mr. Carroll is presently unable to determine whether the information missing from the summary spreadsheets is included in the backup workpapers.  The Bates ranges to which the government directed him contain more than 6,000 pages and nearly 300 spreadsheets.  Mr. Carroll cannot trace each entry in the summary spreadsheet back to the underlying accounting entries and analysis in the 6,000 pages of workpapers and 300 spreadsheets, as he would need to do in order to understand and evaluate the original accounting decisions.  Nor do these 6,000 pages and 300 spreadsheets indicate whether each entry in each spreadsheet is alleged to be fraudulent.  The summary spreadsheets themselves include thousands of cells referencing accounting entries that may have affected SS-NOI, with no way of knowing whether the government believes each of those entries (or any of their specific component entries) were fraudulent, or whether support for those entries is included in the workpapers.  Only a bill of particulars will help Mr. Carroll begin to understand the transactions at issue.

### 3.     The summary spreadsheets are over-inclusive

The "single" Marks Paneth "summary" spreadsheet the government offered is also substantially *over*-inclusive.  It includes, in nearly every quarter, hundreds of accounting entries that the government could not possibly be alleging are fraudulent, but rather appear to be minor errors in computation or classification.  For example, the summary spreadsheet reflects an adjustment made in the amount of $1.48.  *See, e.g.*, Ex. D, AJE No. 33, Q2 2015, "Amount to reverse STX Q2 2015."  Surely, Marks Paneth did not conclude and the government does not contend that the CEO of a company with over $9 billion in assets participated in a fraud to manipulate the recognition of such a miniscule amount.  Rather, it seems more likely that Marks

14

Paneth identified this entry as an error and made this clean-up adjustment as part of their larger review.

"Perhaps the most frequent case in which particulars are warranted is where discovery is overwhelmingly extensive *and* the government fails to designate which documents it intends to introduce and which documents are merely relevant to the defense." *Mahaffy*, 446 F. Supp. 2d at 119 (emphasis in original). As it stands, the summary spreadsheets give no indication of which underlying accounting actions are alleged to be fraud, rather than inconsequential error. A bill of particulars is therefore necessary to clarify the specific items the government actually believes were the product of fraudulent accounting.

### 4.    Neither the workpapers nor the summary spreadsheets address accounting entries that were considered but not made

The government's purported alternative to a bill of particulars is deficient in still another respect: The accounting workpapers and summary spreadsheets do not even purport to identify the accounting entries the government contends would have been fraudulent if made (because there was no entry for the forensic accountants to reverse). Mr. Carroll cannot adequately prepare to rebut a claim that a contemplated, but unexecuted, accounting entry would have been fraudulent if made without sufficient time in advance of trial to fully investigate the details of the alleged entry at issue. The government should therefore be required to identify those entries, too.

The Indictment cites accounting entries that were *not* made as evidence of fraudulent conduct. For example, the Indictment alleges that Brixmor employees discussed removing a fee from SS-NOI during Q3 2015, but "[a]fter further discussions, Brixmor did not remove Excluded Fee-2 from SS-NOI in the Comparison Period." Ind. ¶ 32(d). If the government intends to rely on other such discussions in proving its case at trial, as the Indictment suggests it does, then a bill of particulars is required to allow Mr. Carroll to prepare his defense with respect to these

discussions.  Mr. Carroll cannot identify all such conversations without direction from the government.  Brixmor employees—often on emails Mr. Carroll is not copied on—routinely discussed whether properties and/or payments should be included in the calculation of SS-NOI for a given quarter.  This is commonplace in the REIT industry.  *See* Ex. B at WB00363420 (noting that many REITs remove redevelopment properties, prior-year expense recoveries, and non-retail properties (among other items) from the calculation of SS-NOI).  Given the number of entirely legitimate discussions about the removal of properties from the same-store pool, then, Mr. Carroll is at a loss to determine which discussions the government believes were fraudulent in the absence of a bill of particulars.

The government will contend that Mr. Carroll is asking the government to identify each overt act it plans to rely on at trial.  That is not the case (even though "courts have sometimes ordered the government to provide more particulars about overt acts alleged in terms too general to enable the defendant to defend against them," *Rajaratnam*, 2010 WL 2788168, at *3 (citing *United States v. Bin Laden*, 92 F. Supp. 2d 225, 237 (S.D.N.Y. 2000))).  Mr. Carroll is not asking the government to identify all of the dozens of acts that might be involved in a single proposed accounting entry.  Rather, he is asking for the specific unconsummated accounting entries that the government contends were discussed and would have been fraudulent had they been made.  It would be exceedingly difficult (if not impossible) for Mr. Carroll to attempt to determine, as to each discussion of accounting entries, whether the entry would have been proper if made.  If the government intends to level these allegations at trial, it must provide Mr. Carroll with a bill of particulars identifying which such discussions he should be prepared to defend.

**II.      The Government Should Be Required To Identify, Well In Advance of Trial, The Accounting Entries It Intends To Present At Trial**

Given the breadth of the government's charges, and the fact that they appear to be based, in part, on a large number of small-dollar entries, the bill of particulars Mr. Carroll requests— identifying (1) all actually made accounting entries alleged to be fraudulent or improper, and (2) all accounting entries the government contends were considered by the conspirators and would have been fraudulent if made—will undoubtedly include many more entries than the government could possibly plan to prove at trial.  To avoid the unnecessary and significant waste of resources involved in compiling and reviewing every detail of entries that the government believes were fraudulent but does not plan to introduce at trial, Mr. Carroll further requests an order directing the government to identify, well in advance of trial, the particular entries within the bill of particulars that it intends to present to the jury at trial.

**CONCLUSION**

For the foregoing reasons, Mr. Carroll respectfully requests an order directing the government to provide a bill of particulars.

17

Dated: New York, New York
December 20, 2019

Respectfully submitted,

/s/ Peter G. Neiman
PETER G. NEIMAN
ANJAN SAHNI
MICHELLE NICOLE DIAMOND
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

WILLIAM R. MCLUCAS
BRENDA E. LEE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

*Counsel for Michael Carroll*