**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 19-cr-545 (CM) |
| | ) | |
| MICHAEL CARROLL and | ) | |
| MICHAEL PAPPAGALLO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MICHAEL CARROLL'S**
**<u>MOTION TO DISMISS THE INDICTMENT</u>**

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................1

Statement of Facts .......................................................................................................2

    I.      SS-NOI Is A Non-GAAP Metric That Measures Growth From A Specific
           Subset Of Properties ...........................................................................3

    II.     The Alleged Conspiracy To Manipulate SS-NOI ..................................4

Argument .....................................................................................................................9

    I.      The Alleged Adjustments Are Not Quantitatively Material ......................12

    II.     The Alleged Errors Are Not Qualitatively Material ................................13

Conclusion ...............................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Dekalb Cty. Emps.' Ret. Sys. v. Controladora Vuela Compañía De Aviación,*
*S.A.B. de C.V. (Volaris)*,
  No. 15 Civ. 1337 (WHP), 2016 WL 3685089, at *4 (S.D.N.Y. July 6, 2016) .................13, 14

*In re Duke Energy Corp. Sec. Litig.*,
  282 F. Supp. 2d 158 (S.D.N.Y. 2003) .....................................................................................13

*Fisher v. Plessey Co.*,
  103 F.R.D. 150 (S.D.N.Y. 1984) .............................................................................................11

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of*
*Scotland Grp., PLC,*
  783 F.3d 383 (2d Cir. 2015) ................................................................................................9, 14

*Janbay v. Canadian Solar, Inc.*,
  No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ..............................13

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ...................................................................................................10

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
  135 F. Supp. 3d 145 (S.D.N.Y. 2015) ...............................................................................12, 13

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ................................................................................................................11

*United States v. Bodmer*,
  342 F. Supp. 2d 176 (S.D.N.Y. 2004) .....................................................................................11

*United States v. Bongiorno*,
  No. 05 Cr. 390 (SHS), 2006 WL 1140864 (S.D.N.Y. May 1, 2006) ......................................11

*United States v. Litvak*,
  889 F.3d 56 (2d Cir. 2018) ......................................................................................................11

*United States v. Percoco*,
  No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ...................................11

*United States v. Pirro*,
  212 F.3d 86 (2d Cir. 2000) ........................................................................................................9

**Statutes, Rules and Regulations**

15 U.S.C. § 78ff(a)....................................................................................................9

18 U.S.C. § 1350.......................................................................................................9

17 C.F.R.§ 240.10b-5................................................................................................9

17 C.F.R. § 244.100(b) .............................................................................................9

Federal Rule of Criminal Procedure 12(b)...........................................................1, 3

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150 (Aug. 19, 1999)....................*passim*

Defendant Michael Carroll respectfully submits this memorandum of law in support of his motion to dismiss the government's Indictment dated July 30, 2019 (the "Indictment") pursuant to Federal Rule of Criminal Procedure 12(b).

## INTRODUCTION

The charges against Mr. Carroll are unprecedented.  The charges depend on a theory of materiality that makes no economic sense, has been squarely rejected even in civil cases, and is contrary to the conclusions of *both* Big Four accounting firms that reviewed the relevant financial statements.  Under settled law, errors smaller than 5% are presumptively immaterial.  The quarterly errors alleged here are *much* smaller than that—mostly under 1%.  And these tiny errors are not in some central metric like revenue or earnings:  They relate instead to a quarterly metric with no fixed definition under Generally Accepted Accounting Principles ("GAAP"), that Brixmor Property Group Inc. ("Brixmor") voluntarily chose to report toward the back of its financial statements, that was not used to value the company, and that Brixmor warned was *not* a substitute for its reported GAAP earnings.  Nor did the alleged adjustments alter the total mix of information available to investors.  Little wonder, then, that both Ernst & Young ("E&Y") and Deloitte & Touche ("Deloitte") determined that the errors at issue were "inconsequential."

To attempt to make the inconsequential alleged errors in this voluntary, undefined metric appear material, the Indictment resorts to creative math—calculating percentages of percentages in order to generate wildly inflated results.  Using this method, which courts have expressly rejected, the Indictment overstates the size of the alleged errors by as much as 3,800%.  These kinds of mathematical gymnastics have no connection to reality and no place in a criminal case.  Accordingly, the Indictment should be dismissed.

1

## STATEMENT OF FACTS[1]

From 2009 to 2016, Michael Carroll was the Chief Executive Officer ("CEO") of Brixmor and its predecessor entities. Brixmor is a real estate investment trust ("REIT") headquartered in New York City. Like other REITs, Brixmor owns and operates income-producing real estate and related assets. During the relevant period, Brixmor owned hundreds of properties around the country, primarily supermarkets and large retail centers, totaling more than $9 billion in assets. In October 2013, Brixmor became a public company via an initial public offering. Since going public, Brixmor has filed annual and quarterly reports with the United States Securities and Exchange Commission ("SEC").

On July 30, 2019, the government charged Mr. Carroll and others with participating in an accounting fraud scheme.[2] The alleged scheme is decidedly unusual. The government does not allege that Brixmor reported income it did not receive. Nor does it allege that Brixmor misstated any of the many financial metrics it is required to report under GAAP, or even other non-GAAP measures. Rather, the government's theory concerns the timing—not the substance—of accounting decisions made in calculating a single metric that Brixmor was not required to report at all: same-store net operating income ("SS-NOI").

---

[1] The following background is drawn, in part, from the Indictment, the allegations of which are taken as true solely for purposes of this motion to dismiss.

[2] The Indictment charges six counts against Mr. Carroll: Count One alleges a Conspiracy to Commit Securities Fraud and to Make False Filings with the SEC, Indictment ("Ind") ¶¶ 1-39, ECF No. 2; Count Two alleges Securities Fraud, *id.* ¶¶ 40-41; Counts Three and Four allege False Statements in Filings with the SEC for Brixmor's Forms 10-Q for the Third Quarter of 2014 and Second Quarter of 2015, respectively, *id.* ¶¶ 42-43; and Counts Five and Six allege False Certifications of Disclosure Filed with the SEC for Brixmor's Forms 10-Q for the Third Quarter of 2014 and Second Quarter of 2015, respectively, *id.* ¶¶ 44-45. The Indictment also seeks forfeiture of Mr. Carroll's assets traceable to the offenses charged. *Id.* ¶¶ 46-47.

I.      **SS-NOI Is A Non-GAAP Metric That Measures Growth From A Specific Subset Of Properties**

SS-NOI is a non-GAAP metric that measures the performance of a pool of properties (the "same-store pool") in a given quarter or year.[3]  As Brixmor cautioned investors in its public filings, SS-NOI "is not intended to be a performance measure that should be regarded as an alternative to, or more meaningful than, [its] GAAP financial measures."  Declaration of Michelle Nicole Diamond in Support of Michael Carroll's Motion to Dismiss the Indictment ("Diamond Decl."), Ex. A at 21 (Brixmor Property Group Inc., Form S-11, dated July 18, 2013), at 21.  Rather, Brixmor "use[d] [SS-NOI] to review [its] operating results for comparative purposes with respect to previous periods or forecasts, and also to evaluate future prospects."  *Id.*  Brixmor further advised that non-GAAP measures like SS-NOI "have limitations as they do not include all items of income and expense that affect [its] operations," *id.*, and its "computation of [SS-NOI] may differ from similarly titled measures reported by other [REITs] and, therefore, may not be comparable to such other [REITs]," *id.* at 22.  There are no settled rules or authoritative guidance regarding the calculation of SS-NOI.  Rather, REITs are free to develop their own definitions of SS-NOI, considering numerous property- and payment-level accounting line items.  These line items may include base rent, expense reimbursements, general and administrative expenses, operating expenses, and taxes, among others.  Practices vary widely across REITs as to which properties, and which income and expense items, are included in SS-NOI.  *See id.*, Ex. B (Green Street Advisors, Strip Center Sector, dated Sept. 16, 2013) at WB00363420 (describing different methods of calculating SS-NOI at various REITs).[4]

---

[3] SS-NOI is sometimes called same-property net operating income ("SP-NOI").  The two terms are used interchangeably.

[4] The government produced the Green Street Advisors report, along with other materials cited below, to Mr. Carroll in discovery.

Because SS-NOI is limited to a specific subset of properties (the same-store pool) and does not include all income or expenses, it is not a metric that reflects the value of the REIT's full portfolio. And because REITs have discretion in calculating SS-NOI, it is not a useful comparator across REITs.  Given these limitations, analysts generally do not use SS-NOI in REIT valuation models.  *See, e.g.*, *id.*, Ex. C (Green Street Advisors, Brixmor Property Group Company Snapshot, dated Aug. 3, 2015) at WB00317690 (SS-NOI is not listed under "Key Valuation Metrics"); *id.*, Ex. D (Memorandum of Interview of Steve Sakwa, dated Apr. 16, 2019) at USAO_SDNY_0001670 (under "IMPT METRICS IN EVALUATING REIT," stating that Evercore "looks at FFO [fees from operations] and makes adj to FFO"); *id.*, Ex. E (Memorandum of Interview of Steven Rodriguez, dated June 11, 2019) at USAO_SDNY_0001668 ("Rodriguez stated he uses funds from operations ('FFO') and adjusted funds from operations ('AFFO') earnings metrics to measure the stocks he invests in.").

## II.    The Alleged Conspiracy To Manipulate SS-NOI

The Indictment alleges that Mr. Carroll, a non-accountant, conspired with Brixmor's President and Chief Financial Officer, Michael Pappagallo, and two members of Brixmor's accounting team to inflate SS-NOI in some quarters and deflate it in others.  The purpose of the alleged scheme was to "smooth[]" quarterly SS-NOI growth so that each quarter would be consistent with the annual SS-NOI guidance Brixmor provided to the market.  Ind. ¶ 15.  But the Indictment fails to offer any motive that executives would have to fraudulently smooth *quarterly* SS-NOI figures (on which Brixmor did not issue guidance) to fall within *annual* ranges when, even backing out the alleged errors and accepting the government's calculations, it cannot be disputed that:

- Brixmor's SS-NOI grew steadily over the period, from around $193 million in Q3 2013 to more than $218 million in Q3 2015, as did Brixmor's GAAP and other non-GAAP

4

earnings metrics, *see, e.g.*, Brixmor Property Group Inc., Form 10-Q (Dec. 3, 2013), at 34 (Q3 2013); Brixmor Property Group Inc., Form 10-Q (Oct. 26, 2015), at 38 (Q3 2015);

- Brixmor's quarterly SS-NOI results varied in a modest range (up or down only approximately 1% from the mid-point, from 2.6% to 4.8% each quarter), Ind. ¶ 33; and

- Brixmor's *annual* SS-NOI figures essentially matched its *annual* forecasts.

The largest alleged quarterly misstatement in SS-NOI (approximately $2.5 million in Q4 2013) represented just 1.29% of the nearly $194 million in SS-NOI reported for that quarter (and an even smaller percentage of Brixmor's approximately $225 million in net operating income ("NOI")).  In every other quarter, the alleged discrepancy between actual and reported SS-NOI is far less than 1%:

| Reporting Period | Reported SS-NOI[5] | Alleged Error[6] | % Error |
|:---:|:---:|:---:|:---:|
| Q3 2013 | $192,964,000 | -$915,327 | -0.47% |
| Q4 2013 | $193,999,000 | $2,497,347 | 1.29% |
| Q1 2014 | $195,638,000 | $504,169 | 0.26% |
| Q2 2014 | $198,535,000 | $1,232,921 | 0.62% |
| Q3 2014 | $200,465,000 | $1,470,440 | 0.73% |
| Q4 2014 | $201,578,000 | $968,855 | 0.48% |
| Q1 2015 | $215,876,000 | $442,339 | 0.20% |
| Q2 2015 | $218,060,000 | $75,556 | 0.03% |
| Q3 2015 | $219,554,000 | $1,380,454 | 0.63% |

Perhaps for this reason, the Indictment omits these *actual* numbers and focuses instead on

the *change* in SS-NOI as compared to the same quarter in the prior year.  But those figures are

equally tiny:  The largest alleged error in the *change* in SS-NOI is also just 1.3%, in Q3 2014

---

[5] The "Reported SS-NOI" column reflects the SS-NOI numbers disclosed in Brixmor's public filings.  *See, e.g.*, Brixmor Property Group Inc., Form 10-Q (Dec. 3, 2013), at 34 (Q3 2013); Brixmor Property Group Inc., Form 8-K (Feb. 19, 2014), at 15 (Q4 2013); Brixmor Property Group Inc., Form 10-Q (May 7, 2014), at 27 (Q1 2014).

[6] The "Alleged Error" column is based on figures from a spreadsheet the government produced to Mr. Carroll and represented summarizes each of Brixmor's accounting entries alleged to be fraudulent or improper.  *See* Diamond Decl., Ex. F (Marks Paneth "Final" Workpapers) (the "summary spreadsheets") at 1 (Summary of Adjustments to Same Property NOI).  The "Alleged Error" column subtracts the summary spreadsheets' SP-NOI figures listed under the "Adjusted Same Property NOI (as of March 22, 2018)" row from the SP-NOI figures listed under the "Reported Same Property NOI" row for each quarter.  *See id.*  Because the government offered these workpapers in lieu of a bill of particulars, and represented that they are the "final" analysis underlying the charges, the Court may consider this document in resolving the instant motion to dismiss.

(3.9% reported SS-NOI change from Q3 2013 versus 2.6% alleged actual change).  Ind. ¶ 33.

And in most periods, the alleged error in this metric is also below 1%:[7]

| Reporting Period | Reported Change In SS-NOI[8] | Alleged Actual Change In SS-NOI | Difference |
|---|---|---|---|
| Q3 2013 | 3.5% | 4.3% | -0.8% |
| Q4 2013 | 3.9% | 2.8% | 1.1% |
| Q1 2014 | 3.8% | 3.8% | 0.0% |
| Q2 2014 | 3.8% | 3.5% | 0.3% |
| Q3 2014 | 3.9% | 2.6% | 1.3% |
| Q4 2014 | 3.9% | 4.8% | -0.9% |
| Q1 2015 | 3.4% | 3.3% | 0.1% |
| Q2 2015 | 3.6% | 4.2% | -0.6% |
| Q3 2015 | 3.6% | 3.5% | 0.1% |

Brixmor's outside auditors from the relevant time period, E&Y and Deloitte, were asked

to assess the effect of these alleged errors on Brixmor's financial statements.  Both described

them as "inconsequential" and concluded that Brixmor did not need to restate its financials to

correct the alleged errors.  *See* Diamond Decl., Ex. G (E&Y, Memorandum, dated Feb. 23, 2016)

("E&Y Memo") at EY-BRIX-2015-CONCUR-000026 ("Based on our evaluation of both

quantitative and qualitative factors, we concluded that the errors are inconsequential individually

and in the aggregate on the [audited] financial statements."); *id.* at EY-BRIX-2015-CONCUR-

---

[7] That is true notwithstanding the roll-forward effect of the adjustments.  Because SS-NOI growth is calculated by comparing two quarters, errors in SS-NOI in a single quarter affect the SS-NOI growth in *two* quarters—the quarter in which the error is made and the quarter one year later (which must be compared to that prior period).

[8] The "Reported SS-NOI Growth" and "Actual SS-NOI Growth" are taken from the Indictment. Ind. ¶ 33.  The column labeled "Difference" is calculated by subtracting the figures in the third column from the figures in the second column.

000034 ("The errors are not significant on a gross or net basis to [FFO, EBITDA, or SS-NOI] for both 2014 and 2013."); *id.*, Ex. H (Deloitte, Memorandum, dated Feb. 2, 2016) at DT-00004896 ("[D]ue to the inconsequential impact to the financial statements (see the SAB 99/108 memo and analysis at A/2518) we have concluded that neither the opening equity nor quarterly financial statements for 2015 need to be restated."); *see also* E&Y Memo at EY-BRIX-2015-CONCUR-000036 ("[T]he overall impacts of the misstatements are not material to the financial statements or the key metrics focused on by investors or analysts."); *id.* at EY-BRIX-2015-CONCUR-000037 ("The errors did not impact the Analysts' consensus expectations for 2013 or 2014."); *id.* at EY-BRIX-2015-CONCUR-000035 ("The errors do not disguise a change in earnings or other trends . . . .").

To gin up the impression of materiality, the Indictment resorts to a mathematical sleight of hand, calculating for each quarter the percentage change in the percentage change in SS-NOI as compared to the same quarter in the prior year. This strategy wildly inflates the alleged errors. The alleged error in Q3 2013 SS-NOI was around $915,000, less than 0.5% of the $193 million total SS-NOI for the quarter. The alleged error in Q3 2014 SS-NOI was $1.4 million out of $200 million, or around 0.7%. Correcting these two alleged errors lowers the SS-NOI growth across the two periods by 1.3%, from 3.9% to 2.6%. The Indictment instead calculates the percentage by which 3.9% exceeds 2.6%—and thus alleges that Brixmor's public filing was off by *fifty percent*. Ind. ¶ 33. That percentages-of-percentages calculation produces a percentage error that is more than *thirty-eight* times larger than the actual difference between the reported and allegedly correct growth figure.

The Indictment repeats this same bogus math for each quarter, creating the illusion of materiality for errors that never even approach the presumptive 5% threshold. In fact, it is telling

that even after Brixmor disclosed as-adjusted SS-NOI figures and asked its Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, and another accounting employee to resign, it did not revise its annual guidance for 2015 and reported an SS-NOI growth rate for the full year 2015 (after reversing all the changes alleged to be fraudulent) within the initially disclosed guidance range.

## ARGUMENT

We recognize that motions to dismiss indictments are rarely granted, and that materiality is typically a factual issue for a properly instructed jury, rather than a basis to dismiss.  But this case is different and highly unusual.  The government has based its case on a percentages-of-percentages theory of materiality that is invalid as a matter of law.  The parties should not bear the expense and strain of trial on a theory that cannot support conviction.  In these unusual circumstances, dismissal is appropriate.

"An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000). Here, the Indictment should be dismissed for failure to establish materiality, which is an element of each offense charged. *See* 15 U.S.C. § 78ff(a) (violations must be "material"); 17 C.F.R.§ 240.10b-5(b) (same); 17 C.F.R. § 244.100(b) (same); 18 U.S.C. § 1350(b) (same).

A misstatement is material if "there is a *substantial* likelihood that a reasonable shareholder would consider it important in deciding how to act." *IBEW Local Union No. 58 Pension Tr. Fund & Ann. Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (emphasis added; quotation marks omitted).  "In other words, for the misstatement to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id*. at 389-90 (alternations and quotation marks omitted).

Presumptively, a misstatement of less than 5% is not material, even where the misstatement

relates to an important, required, well-defined metric of central relevance to valuation.  *See id.* at

390; SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed. Reg. 45,150, 45,151 (Aug. 19,

1999).

Here, the alleged misstatements fall well below this threshold and are thus presumptively

immaterial.  Moreover, the alleged misstatements relate to a voluntary, undefined metric—SS-

NOI—that did not even alter the overall trend with respect to that metric, as SS-NOI grew

steadily and in a narrow range even if one excluded all the alleged misstatements.  There are thus

no qualitative circumstances that can come close to overcoming the presumption of immateriality

here.  *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (stating that "a court

must consider both quantitative and qualitative factors in assessing an item's materiality"

(quotation marks omitted)).

No evidence the government may present at trial would change the immateriality of these

errors, even if the government could find witnesses to testify that these alleged misstatements

mattered to them.[9]  "The question of materiality . . . is an *objective* one, involving the

---

[9] Multiple analysts have already told the government that SS-NOI and these errors were not important to them.  *See* Diamond Decl., Ex. I (Memorandum of Interview of Michael Mueller, dated Jan. 12, 2017) at USAO_SDNY_0001662 ("MUELLER feels the people and institutions that trade BRIXMOR do not put much weight in to [sic] the quarterly SSNOI number."); *id.*, Ex. D at USAO_SDNY_0001670 (under "IMPT METRICS IN EVALUATING REIT," stating that Evercore "looks at FFO and makes adj to FFO"); *id.*, Ex. E at USAO_SDNY_0001668 ("Rodriguez stated he uses funds from operations ('FFO') and adjusted funds from operations ('AFFO') earnings metrics to measure the stocks he invests in."); *id.*, Ex. J (Memorandum of Interview of Ki Bin Kim, dated July 12, 2018) at USAO_SDNY_0001658 ("Kim said the 'As If Adjusted' numbers seen in the table 'Year-Over-Year Changes in Same Property NOI' were not bad and did not really move the needle over the two year span."); *id.*, Ex. K (Memorandum of Interview of Anthony Paolone, dated Jan. 12, 2017) at USAO_SDNY_0001664 ("Fluctuations quarter to quarter in SSNOI are not concerning."); *id.*, Ex. L (Notes of Interview of Jeffrey Donnelly, dated Nov. 2, 2018) at USAO_SDNY_0001655 ("With a company of this size, being

significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976) (emphasis added); *see also United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) ("The standard of a reasonable investor . . . is an *objective* one." (quotation marks omitted; emphasis added)).  As the issue of materiality is "obviously objective and general rather than subjective and individual," the Court can, and should, evaluate it at this stage.  *Fisher v. Plessey Co.*, 103 F.R.D. 150, 155 (S.D.N.Y. 1984); *see also Litvak*, 889 F.3d at 65 ("Materiality cannot be proven by the mistaken beliefs of the worst informed trader in a market.").  "[I]t would be improper and a waste of resources for everyone involved to conduct a lengthy trial . . . and submit the case to a jury only [for the Court] to rule on a post-trial motion that the government's theory of criminal liability fails no matter what facts it was able to adduce at trial."  *United States v. Bongiorno*, No. 05 Cr. 390 (SHS), 2006 WL 1140864, at *4 (S.D.N.Y. May 1, 2006) (citing *United States v. Mowad*, 641 F.2d 1067, 1069, 1071-72 (2d Cir. 1981)); *see also United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *7 (S.D.N.Y. Dec. 11, 2017) (an indictment may be "dismissed on materiality grounds if it is facially insufficient, meaning that no reasonable juror could find the alleged misstatement to be material"); *United States v. Bodmer*, 342 F. Supp. 2d 176, 180 (S.D.N.Y. 2004) (a court may consider a defense raised pretrial if "the trial of the general issue of guilt 'would be of no assistance in determining the validity of the defense'" (quoting *United States v. Covington*, 395 U.S. 57, 60-61 (1969))). The Court should dismiss the Indictment.

---

off of earnings by just a million or so would not necessarily a big deal [sic] . . . . SS-NOI in particular can be choppy in the short run.").

I.      **The Alleged Adjustments Are Not Quantitatively Material**

The alleged adjustments do not even approach the 5% minimum threshold.  The largest alleged quarterly adjustment is 1.3% of both SS-NOI and SS-NOI change.  *See* Ind. ¶ 33 (2.6% "actual" compared to 3.9% reported for Q3 2014).  The smallest:  zero percent.  *See id.* (3.8% "actual" SS-NOI compared to 3.8% reported for Q1 2014).

The Indictment's effort to recalculate these changes using percentages-of-percentages produces illogical results and fails as a matter of law.  To illustrate the problem, consider a company with $1 billion in revenue but just $1 in net income one quarter, and the same $1 billion in revenue and $0.50 of net income the next quarter.  No reasonable investor would view that company as having experienced a material decline in net income or profit percentage.  Yet on the government's percentages-of-percentages approach, the profit percentage plummeted 50%.  Likewise, no reasonable investor would look at Brixmor's Q3 2014 allegedly adjusted figures and perceive that a change in SS-NOI growth from the 3.9% reported to 2.6% "actual" was a difference of 50% rather than a difference of 1.3%.  *See id.*  The government's proposed method of calculation vastly exaggerates the magnitude and significance of the alleged misstatements.  Although for purposes of this motion the Court must accept as true the government's alleged "actual" quarterly SS-NOI growth figures, it need not—and should not—accept the government's contrived arithmetic.[10]

Indeed, courts in this Circuit have rejected "invitation[s]" to "adopt[] relative rather than absolute percentage change as the appropriate yardstick under SAB No. 99."  *In re Ply Gem*

---

[10] Brixmor did not calculate or report percentage changes that way.  *See, e.g.*, Brixmor Property Group Inc., Form 10-Q (May 7, 2014), at 27 (reporting within Brixmor's 10-Q's "Same Property Net Operating Income of Same Property Portfolio" section that the year-over-year change between the billed occupancy rate of 90.6% and 89.6% was 1.0%, and the year-over-year change of the leased occupancy rate of 92.4% and 91.3% was 1.1%).

*Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 153 (S.D.N.Y. 2015) (rejecting "invitation [to] consider the decline from 23.9% to 20.2% a 15% decline" (quotation marks omitted)).  And for good reason.  To do otherwise would permit the government to "machine the[] percentages" and shoehorn any alleged misstatement in a public filing into a violation of the securities laws. *Dekalb Cty. Emps.' Ret. Sys. v. Controladora Vuela Compañía De Aviación, S.A.B. de C.V. (Volaris)*, No. 15 Civ. 1337 (WHP), 2016 WL 3685089, at *4 (S.D.N.Y. July 6, 2016) (rejecting attempt to "machine the[] percentages [by] dividing the total deferral [of previously recognized non-ticket revenue] by Volaris's non-ticket revenues alone" and explaining that "the relevant question for quantitative materiality is the effect a misstatement has on the total value of a defendant's relevant assets" (emphasis omitted)).

The numbers are what they are.  And they are nowhere near the 5% threshold.  These errors are far too small to support even civil charges.  *Id.* (dismissing claims after concluding that $3.6 million of deferred revenue recognized in the improper quarter was immaterial because it was less than 5% of the implicated quarter's revenue); *Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *6 (S.D.N.Y. Mar. 30, 2012) (misclassification of $5.8 million consignment as a sale was immaterial because it amounted to less than 5% of revenue); *In re Duke Energy Corp. Sec. Litig.*, 282 F. Supp. 2d 158, 161 (S.D.N.Y. 2003) (dismissing claims after finding an inflation in revenue that amounted to 0.3% of revenue to be "an immaterial percentage as a matter of law"), *aff'd*, 113 F. App'x 427 (2d Cir. 2004).  They cannot support a criminal case.

## II.   The Alleged Errors Are Not Qualitatively Material

The SEC's SAB No. 99 contains "an illustrative list" of qualitative factors that courts may use to assess whether a misstatement is material.  *In re Ply Gem*, 135 F. Supp. 3d at 152. "Such qualitative factors include, among others:  whether the misstatement 'arises from an item

capable of precise measurement'; 'masks a change in earnings or other trends'; 'changes a loss

into income or vice versa'; 'concerns a segment or other portion of the . . . business that has been

identified as playing a significant role in the registrant's operations or profitability'; 'involves

concealment of an unlawful transaction'; and whether 'a known misstatement may result in a

significant positive or negative market reaction.'" *IBEW*, 783 F.3d at 391 (alteration in original)

(quoting SAB No. 99, 64 Fed. Reg. at 45,152).

       None of the factors suggests that the alleged SS-NOI adjustments were material—*i.e.*,

that they "would have assumed disproportionate significance for investors" such that the total

mix of information available was significantly altered. *Dekalb Cty.*, 2016 WL 3685089, at *4.

The government's allegations concern the time at which Brixmor recognized income. It has not

alleged that Brixmor misstated the amount of income it had, but rather that Brixmor recognized

income in improper quarters in order to present smooth, consistent SS-NOI growth. Like

Brixmor's reported SS-NOI figures, the government's "actual" SS-NOI growth figures reflect

year-over-year growth every quarter. The alleged misstatements plainly did not "change[] a loss

into income or vice versa." SAB No. 99, 64 Fed. Reg. at 45,152; *see also* E&Y Memo at EY-

BRIX-2015-CONCUR-000035 ("The errors . . . do not change net income to a loss in either

2014 or 2013.").

       Similarly, the alleged adjustments did not "mask[] a change in earnings or other trends,"

SAB No. 99, 64 Fed. Reg. at 45,152, because Brixmor's SS-NOI growth was real; even on the

government's numbers SS-NOI increased steadily, and in a narrow range (between 2.6% and

4.8% in every quarter). *See also* E&Y Memo at EY-BRIX-2015-CONCUR-000035 ("The errors

do not disguise a change in earnings or other trends . . . ."). Moreover, the reported SS-NOI

growth rates reflected the consistent positive growth also reflected in Brixmor's GAAP and other non-GAAP metrics.

Nor did the alleged adjustments "hide[] a failure to meet analysts' consensus expectations for the enterprise."  SAB No. 99, 64 Fed. Reg. at 45,152; *see also* E&Y Memo at EY-BRIX-2015-CONCUR-000037 ("The errors did not impact the Analysts' consensus expectations for 2013 or 2014.").  Brixmor provided the market guidance *only* for annual SS-NOI growth each year—not quarterly SS-NOI growth—and the Indictment does not allege *any* material misstatement of the annual numbers.  Nor did the adjustments have material impact on "[Mr. Carroll's] compensation."  SAB No. 99, 64 Fed. Reg. at 45,152; *see also* E&Y Memo at EY-BRIX-2015-CONCUR-000035 ("The errors did not impact management's compensation.").  The remaining SAB No. 99 factors are not even arguably relevant.  *See* SAB No. 99, 64 Fed. Reg. at 45,152 (whether the alleged misstatement "affects the registrant's compliance with regulatory requirements," "affects the registrant's compliance with loan covenants or other contractual requirements," "arises from an item capable of precise measurement or whether it arises from an estimate," "concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability," or "involves concealment of an unlawful transaction"); *see also, e.g.*, E&Y Memo at EY-BRIX-2015-CONCUR-000034-36 (stating, *inter alia*, that the misstatements had "no statutory or regulatory reporting requirements," did "not affect the entity's compliance with covenants," did "not impact segment information," and did "not cause the financial statement disclosures not to be adequate or omit information . . . important to users [sic] understanding of the financial position, financial performance or cash flows of the entity or which conveys something that is either false or misleading.").

In short, the alleged errors are well below the quantitative materiality threshold, and no qualitative factors warrant a different conclusion.  The Indictment should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Carroll's motion and dismiss the Indictment in its entirety.

Dated: New York, New York
       December 20, 2019

Respectfully submitted,

/s/ Peter G. Neiman
PETER G. NEIMAN
ANJAN SAHNI
MICHELLE NICOLE DIAMOND
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

WILLIAM R. MCLUCAS
BRENDA E. LEE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

*Counsel for Michael Carroll*