**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 19-cr-545 (CM) |
| | ) | |
| MICHAEL CARROLL and | ) | |
| MICHAEL PAPPAGALLO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF MICHAEL CARROLL'S
MOTION TO DISMISS THE INDICTMENT, MOTION FOR A BILL OF
PARTICULARS, MOTION TO COMPEL PRODUCTION OF *BRADY* MATERIALS,
<u>AND MOTION TO COMPEL DISCOVERY</u>**

## **TABLE OF CONTENTS**

Page

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................1

I.     Mr. Carroll's Motion To Dismiss Should Be Granted.................................1

    A.     SS-NOI Is Central To This Case........................................................4

    B.     The Alleged Adjustments Are Presumptively Immaterial..........................4

    C.     The Government's Qualitative Materiality Arguments Do Not
Overcome The Presumption That The Alleged Errors Are Not Material....7

II.    Mr. Carroll's Motion For A Bill Of Particulars Should Be Granted .......................10

    A.     The Summary Spreadsheet And Workpapers Are Overinclusive.............11

    B.     The Summary Spreadsheet And Workpapers Are Also Underinclusive ...12

    C.     None Of The Other Materials The Government Cites
Solves The Problem ........................................................................17

        1.     The Indictment does not adequately specify the charges against
Mr. Carroll ...........................................................................17

        2.     The government's disorganized discovery is not an adequate
substitute to a bill of particulars...........................................17

        3.     A bill of particulars is necessary to enable Mr. Carroll to
prepare a defense related to unconsummated accounting entries ..17

    D.     Case Law Supports Mr. Carroll's Motion For A Bill Of Particulars.........18

    E.     Early Identification Of The Accounting Entries At Issue Will
Not Unduly Constrain The Government At Trial ......................................19

III.   Mr. Carroll's Motion To Compel Production Of *Brady* Materials
Should Be Granted .....................................................................................20

    A.     The Government Should Produce The Requested Material From *Block*...20

    B.     The Government Should Review The SEC's Full Investigative File ........21

IV.   Mr. Carroll's Motion To Compel Discovery Should Be Granted ..........................23

CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)......................................................................................................5

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015)...........................................................................9

*In re Candland*,
  90 F.3d 1466 (9th Cir. 1996) .......................................................................................8

*Dekalb Cty. Emps.' Ret. Sys. v. Controladora Vuela Compañía De Aviación,*
  *S.A.B. de C.V. (Volaris)*,
  No. 15 Civ. 1337 (WHP), 2016 WL 3685089 (S.D.N.Y. July 6, 2016).........................5, 6, 20

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000)..........................................................................................8

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ....................................................................................9

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
  135 F. Supp. 3d 145 (S.D.N.Y. 2015).......................................................................3, 5

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
  No. 14 Civ. 3577 (JPO), 2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016).............................5, 6

*S.E.C. v. Leslie*,
  No. 07 Civ. 3444 (JF), 2012 WL 116562 (N.D. Cal. Jan. 13, 2012)........................9

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015)..........................................................................9

*Takara Tr. v. Molex Inc.*,
  429 F. Supp. 2d 960 (N.D. Ill. 2006) ...........................................................................9

*United States v. Avellino*,
  136 F.3d 249 (2d Cir. 1998)........................................................................................21

*United States v. Bortnovsky*,
  820 F.2d 572 (2d Cir. 1987).................................................................................12, 18

*United States v. Block*,
  No. 16 Cr. 595 (JPO), 2017 WL 1608905 (S.D.N.Y. Apr. 28, 2017) .................2, 19

*United States v. Bonventre*,
No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013)....................................20

*United States v. Coppa*,
267 F.3d 132 (2d Cir. 2001)............................................................................................25

*United States v. Connelly*,
No. 16 Cr. 370 (CM), 2017 WL 2537808 (S.D.N.Y. May 24, 2017)....................................19

*United States v. Cuti*,
No. 08 Cr. 972 (DAB), 2009 WL 3154310 (S.D.N.Y. Sept. 24, 2009)................................19

*United States v. Gupta*,
848 F. Supp. 2d 491 (S.D.N.Y. 2012)...............................................................................22

*United States v. Kohring*,
637 F.3d 895 (9th Cir. 2011) ...........................................................................................23

*United States v. Mosca*,
475 F.2d 1052 (2d Cir. 1973)...........................................................................................23

*United States v. Samsonov*,
No. 07 Cr. 1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009)....................................19

*United States v. Savin*,
No. 00 Cr. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001).....................................18

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008).............................................................................................25

**Statutes, Rules, and Regulations**

18 U.S.C. § 3500..................................................................................................................25

SEC Staff Accounting Bulletin No. 99,
64 Fed. Reg. 45,150 (Aug. 19, 1999)..................................................................................8

**Other Authorities**

James J. Park, *Assessing the Materiality of Financial Misstatements*,
34 J. Corp. L. 513 (2009)....................................................................................................5

U.S. Dep't of Justice, Justice Manual § 9-11-233 ...................................................................4

Defendant Michael Carroll respectfully submits this reply memorandum in further support of his motions to dismiss the Indictment (ECF No. 55), for a bill of particulars (ECF No. 52), to compel production of *Brady* materials (ECF No. 58), and to compel discovery (ECF No. 43).

## INTRODUCTION

The government's opposition does nothing to change the fundamental issue in this case—that it never should have been brought. The charges against Mr. Carroll are based entirely on miniscule adjustments to a non-GAAP metric that were, by all accounts, quantitatively and qualitatively immaterial. That is what two major accounting firms concluded. And that is what multiple analysts told the government. Given that, the Indictment should be dismissed.

But if these charges are allowed to stand, Mr. Carroll must be given access to basic information that he needs to defend himself. At a minimum, he is entitled to know the specific entries the government contends were fraudulent and the contemplated (but not consummated) entries that the government intends to argue were also part of the alleged scheme. He is entitled to all *Brady* material. And he is entitled to know whether the government's investigation has been tainted by improper communications. We address each issue in turn.

## ARGUMENT

### I.   Mr. Carroll's Motion To Dismiss Should Be Granted

The government does not dispute any of the central points in Mr. Carroll's motion to dismiss:

- The allegedly improper adjustments to Brixmor's SS-NOI were tiny in the context of Brixmor's overall business;

- Two major accounting firms, Ernst & Young and Deloitte, reviewed the adjustments and concluded they were immaterial, both quantitatively and qualitatively;

- Materiality is an essential element of all the offenses charged; and

1

- A court may properly dismiss when "reasonable minds could not differ on the question of [a misstatement's] importance." *United States v. Block*, No. 16 Cr. 595 (JPO), 2017 WL 1608905, at *4 (S.D.N.Y. Apr. 28, 2017) (citation omitted).

The government also does not even attempt to show that reasonable minds could find the adjustments to SS-NOI material. Nor could it. No reasonable investor would view Brixmor as a promising investment if SS-NOI were $194 million (as reported in Q4 2013, the quarter with the largest alleged error) but unattractive if it were "only" $191.5 million (as the government alleges). Brixmor's quarterly SS-NOI was always larger than $190 million and always growing compared to the prior year, even backing out all of the allegedly improper decisions about when to recognize certain small income items. And Brixmor was strong and growing across numerous other operating metrics, including rental income, occupancy rates, and Funds From Operations. *See, e.g.*, Brixmor Property Group Inc., Form 10-K (Feb. 19, 2015), at 49, 53 (noting year-over-year growth in these metrics); Brixmor Property Group Inc., Form 10-K (Feb. 29, 2016), at 7, 39, 50 (same). One or two million dollars of fluctuation up and down in Brixmor's quarterly SS-NOI, which is all the Indictment alleges, would not meaningfully impact any reasonable assessment of Brixmor's prospects.

The government argues in response that SS-NOI is the wrong way to look at this case. Rather, the government asks the Court to assess materiality in terms of the alleged scheme's impact on what the government calls "SS-NOI Growth."[1] The government argues that the scheme had a quantitatively material impact on that metric and that qualitative factors also support a materiality conclusion. This theory fails, for multiple reasons.

---

[1] The Indictment capitalizes this term, as if it were a separately defined metric. It is not. Brixmor defined SS-NOI; SS-NOI Growth is simply a calculation.

*First*, SS-NOI Growth is just a comparison of SS-NOI in two different quarters.  If the errors in SS-NOI were not material (and the government does not even allege they were), the resulting errors in SS-NOI Growth cannot be material either.  After all, no *reasonable* investor would find important a change in a quarterly growth rate that is attributable entirely to changes in SS-NOI that the investor recognizes are *not* important.

*Second*, even if it made sense to evaluate the materiality of changes in SS-NOI Growth separately from changes in SS-NOI itself, the changes in growth rates are also tiny, peaking at just 1.3% in Q3 2014, well below the 5% threshold under which immateriality is presumed.  The government proposes using relative rather than absolute percentages to measure materiality and offers self-serving graphs and a strained hypothetical in support of that approach.  But as multiple courts have found, absolute, rather than relative, percentage changes provide the "appropriate yardstick" for assessing the presumption of immateriality, precisely because relative percentage measures tend to distort, making tiny issues appear enormous.  *In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 153 (S.D.N.Y. 2015).  The government's need to resort to selectively scaled graphs and a flawed hypothetical confirm that its approach is wrong.

*Third*, the government's efforts to show qualitative materiality also fail.  The government's arguments depend on improperly replacing the *objective* materiality question with a *subjective* inquiry into the defendants' intent, which would effectively read the materiality requirement out of the criminal law.  And none of the other qualitative factors the government presents is relevant here.

The bottom line is that the allegedly improper accounting entries here, determining which quarters within the fiscal year to recognize small-dollar items that aggregate to less than 1% of annual SS-NOI, are both individually and in the aggregate far too tiny to impact a reasonable investor.  That is what two major accounting firms and multiple analysts the government

interviewed all concluded.[2]  The government's insistence on nonetheless pursuing criminal charges is disappointing and misguided.  No reasonable juror could find materiality beyond a reasonable doubt, and the Court should dismiss the Indictment.

### A.    SS-NOI Is Central To This Case

The government dismisses the relevance of SS-NOI, arguing that the Indictment's "alleged errors" are "not only errors" of SS-NOI but also of SS-NOI Growth.  ECF No. 65 ("Opp.") 12.  That misses the point:  SS-NOI Growth is just a comparison of SS-NOI across two different periods.  *See* Indictment ¶ 10.  SS-NOI is the *only* input to calculating SS-NOI Growth.  And each of the three alleged means of the conspiracy involved alleged changes to SS-NOI, not direct changes to SS-NOI Growth.  *See id.* ¶ 21.  If errors in Brixmor's reported SS-NOI for two quarters are not material, it cannot be the case that comparing SS-NOI for those two quarters somehow makes those errors material.

The discrepancy between Brixmor's reported and alleged actual SS-NOI numbers are plainly quantitatively immaterial, far less than 1% in most quarters.  *See* ECF No. 56 (Carroll Mem. in Supp. of Mot. to Dismiss) ("MTD Mem.") at 5-6.  No reasonable investor would find material a change in SS-NOI Growth caused by clearly immaterial changes in the *only* input to SS-NOI Growth.

### B.    The Alleged Adjustments Are Presumptively Immaterial

Even if the Court evaluated the materiality of the alleged changes in SS-NOI Growth apart from Brixmor's SS-NOI (and it should not), alleged SS-NOI Growth adjustments were at most 1.3%—well below the 5% threshold of presumptive immateriality.  *See* MTD Mem. 12.

---

[2] The government has declined to say whether it disclosed this materially exculpatory information to the grand jury, as required by Justice Department policy.  *See* ECF No. 54-6 at 4; ECF No. 45-4 at 3; ECF No. 45-3 at 2.  *See also generally* U.S. Dep't of Justice, JUSTICE MANUAL § 9-11-233.

The government argues that relative, rather than absolute, percentages should be used to assess whether the presumption applies.  Opp. 12-13.  Yet the government does not cite a single case supporting its position, a position that courts have appropriately rejected.  *See In re Ply Gem*, 135 F. Supp. 3d at 153 (rejecting "relative rather than absolute percentage change [as] the appropriate yardstick under SAB No. 99"); *Dekalb Cty. Emps.' Ret. Sys. v. Controladora Vuela Compañía De Aviación, S.A.B. de C.V. (Volaris)*, No. 15 Civ. 1337 (WHP), 2016 WL 3685089, at *4 (S.D.N.Y. July 6, 2016) (rejecting effort to "machine" percentages).  The purpose of the materiality requirement is to avoid "bury[ing] the shareholder in an avalanche of trivial information." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).[3]  Using relative, percentage-of-percentage calculations as the yardstick for quantitative materiality would have the opposite effect—requiring disclosure of trivial information, because (as this case demonstrates) even tiny changes in absolute metrics can lead mathematically to large percentage-of-percentage changes.

The government's attempts to distinguish *Ply Gem* and *Dekalb* fail.  The government points to the *Ply Gem* court's declining to dismiss an amended complaint.  *See In re Ply Gem Holdings, Inc. Sec. Litig.* ("*Ply Gem II*"), No. 14 Civ. 3577 (JPO), 2016 WL 5339541 at *1 (S.D.N.Y. Sept. 23, 2016).  But *Ply Gem II* did not retreat at all from *Ply Gem*'s rejection of percentage-of-percentage calculations as the yardstick of quantitative materiality.  *Ply Gem II* instead concluded that the plaintiffs had adequately alleged materiality through *new* allegations showing that the alleged misstatements impacted many different *absolute* metrics, including

---

[3] The materiality requirement also recognizes that accounting is not an exact science, but necessarily includes judgments and prefers finality to an endless effort to correct every last minor inaccuracy.  *See* James J. Park, *Assessing the Materiality of Financial Misstatements*, 34 J. Corp. L. 513, 514-15 (2009) ("[B]ecause of the complexity of public companies, as well as the ambiguity of the [GAAP] with which financial statements must conform, it is expensive to ensure that the accounting for every transaction is appropriate.  The law attempts to balance such concerns by making securities fraud liability contingent on a showing of materiality.").

gross profit, operating earnings, loss before income taxes, net loss, and comprehensive loss, and, if corrected, "would have turned an operating profit in that segment into a loss." *Id.* at *3. As discussed below, the government can make no such allegations here.

The government dismisses *Dekalb* as "misleadingly deployed." Opp. 14. But *Dekalb*, like this case, concerned the timing of revenue recognition, and, like this case, the amount of revenue at issue was tiny compared to the firm's overall revenue ("just 1.46% of fourth-quarter revenue"). *Dekalb*, 2016 WL 3685089, at *4. The plaintiffs there tried to show materiality by "dividing the total deferral by [defendant's] *non-ticket* revenues alone," similar to what plaintiffs do here, by focusing only on same-store, rather than total, revenue, and only on the *growth* in that revenue. *Id.* (emphasis in original). *Dekalb* appropriately rejected that effort to "machine" the percentages, explaining that the "relevant question for quantitative materiality is the effect the misstatement has on the *total* value of a defendant's relevant assets." *Id. Dekalb* is squarely on point.

Lacking caselaw or logic to support its position on quantitative materiality, the government resorts to pictorial tricks and a flawed hypothetical. The government presents a chart showing what look like large discrepancies between the alleged quarterly "actual" SS-NOI Growth and Brixmor's annual guidance range. But the scale of the chart is radically compressed to a range of just 2.5% to 5%. Opp. 15. Scaled more reasonably, the picture looks very different:



Moreover, the government's industrious salesperson hypothetical is missing precisely the information that would be needed to evaluate materiality.  The government posits a salesperson whose percentage commission rate was cut in half "rightly wonder[ing] why the company took *half* of his [or her] bonus," as if knowing the size of the rate change were enough to know the salesperson had been materially impacted.  Opp. 13 (emphasis in original).  But whether the salesperson was "rightly" upset would not depend on the size of the change in *rate*.  Rather, it would depend on *absolute* facts, including how large the bonus was before and after the change, and how much other compensation the salesperson received.  A salesperson with a $1 million fixed salary whose bonus fell from $5,000 to $2,500 would surely have less cause to complain than a salesperson with a modest fixed salary whose bonus fell from $500,000 to $250,000.  The government's salesperson hypothetical thus confirms Mr. Carroll's point:  percentage-of-percentage calculations are not a useful way to analyze materiality.  And properly analyzed, the changes at issue in SS-NOI and SS-NOI Growth are quite small in the context of Brixmor's very substantial, and well performing, business:  more than $9 billion in total assets, $1 billion in annual net operating income, and more than $190 million in quarterly SS-NOI, along with rising rental income, occupancy rates, and Funds From Operations.  *See supra* at 2.  The alleged misstatements are well below the 5% threshold, and are thus presumptively not material.

### C.    The Government's Qualitative Materiality Arguments Do Not Overcome The Presumption That The Alleged Errors Are Not Material

The core of the government's efforts to show the alleged adjustments are qualitatively material is that they reflect intent to "manage earnings."  Opp. 16-17 (quoting SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed. Reg. 45,150, 45,152 (Aug. 19, 1999)).  But SS-NOI is not "earnings."  It is a non-GAAP metric, related to only a portion of a company's net

operating income,[4] that Brixmor reported quarterly as a small part of a sixty-page supplemental

disclosure, accompanied with substantial disclaimers.  No caselaw, and no guidance, suggests

that simply because a company's management focuses *any* attention on such a metric, that

necessarily makes *any* allegedly improper adjustments to that metric qualitatively material.

Indeed, such a rule would render *all* intentional misstatements material, which would improperly

read the materiality requirement out of the statute.  *See* SAB No. 99, 64 Fed. Reg. at 45,152

("[T]he intent of management does *not* render a misstatement material." (emphasis added)); *In re*

*Candland*, 90 F.3d 1466, 1470 (9th Cir. 1996) ("INA's argument that any intentional misstatement

constitutes a material misstatement renders the materiality requirement surplusage.").

Nor is this case like *Ganino v. Citizens Utilities Co.*, on which the government relies

extensively.  Opp. 17-18.  That case involved a classic effort to hide a failure to meet analyst

expectations, which is relevant to qualitative materiality.  The plaintiffs there alleged a scheme to

book in 1996 fees disclosed to the market in 1995, and that "analysts' projections of Citizens'

income for the first six (6) months of 1996 were met and exceeded only as a result of the

additional [fee] income."  228 F.3d 154, 166 (2d Cir. 2000) (internal quotation marks and

alteration omitted).  That is not the case here.  The Indictment alleges Brixmor provided

guidance on *annual*, not quarterly, SS-NOI growth.  Indictment ¶ 16.  Shifting income between

quarters within the year can have no impact on whether *annual* expectations are met.  There is no

allegation of material amounts of SS-NOI being shifted *between* years, or of a material failure to

meet *annual* expectations with, or without, the alleged fraud.  This is *not* a case about hiding a

failure to meet analyst expectations.

---

[4] In Q4 2013, for example, Brixmor's NOI was $225 million, and its SS-NOI was $194 million, meaning that nearly 14% of NOI was excluded from SS-NOI.  *See* Brixmor Property Group Inc., Supplemental Disclosure (Dec. 31, 2013), at 3, 12.

The other authorities cited by the government are similarly inapposite.  *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3, 16 (2d Cir. 2011) (alleging concealing "failure to meet analysts' expectations"); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 722, 736, 738 (S.D.N.Y. 2015) (alleging misstatements in a "noteworthy segment of . . . overall business"); *S.E.C. v. Leslie*, No. 07 Civ. 3444 (JF) (PSG), 2012 WL 116562, at *4-5, *7 (N.D. Cal. Jan. 13, 2012) (alleging GAAP violations that impacted metrics analysts viewed as "significant indicators of the company's health"); *Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 965, 979 (N.D. Ill. 2006) (alleging "numerous . . . GAAP violations" to manipulate metrics "in accordance with [analysts'] expectations" for quarterly numbers).[5]

The government also cites a list of other factors that may—in appropriate circumstances— be relevant to assessing qualitative materiality.  *See* Opp. 16 (quoting SAB No. 99, 64 Fed. Reg. at 45,152).  But *none* of the other factors the government references is relevant here.  The government cannot establish that the alleged adjustments "masked a change in earnings or other trends," *id.*, because SS-NOI is *not* earnings, and in any event, even without the alleged fraud, Brixmor's SS-NOI Growth was consistently positive and varied only in a narrow range.  Indictment ¶ 33.  Nor does the Indictment allege that the alleged adjustments had "the effect of increasing [Mr. Carroll's] compensation."  Opp. 16 (quoting SAB No. 99, 64 Fed. Reg. at 45,152).  Likewise, the Indictment is devoid of any allegations regarding the "price of [Brixmor's] securities."  *Id.*

At bottom, the quantitative and qualitative factors point to the same conclusion reached by both Ernst & Young and Deloitte, and multiple Brixmor analysts (and by the company itself,

---

[5] *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330 (S.D.N.Y. 2015), does not even concern alleged misstatements of reported earnings data.  *See id.* at 335, 349 (alleging misstatements about a dark pool operations' "transparency and safeguards").

in concluding that no restatement was required):  the alleged errors are just not material.  The Indictment should be dismissed.

## II.      Mr. Carroll's Motion For A Bill Of Particulars Should Be Granted

The government produced 100,000 documents, containing information about an enormous number of accounting entries—some consummated, and some only discussed (as part of planning or forecasting, or otherwise).  The alleged scheme involved an unknown subset of these entries, totaling at least in the thousands, many of them for small dollar amounts.  But the government insists it should not be required to provide a bill of particulars identifying either (1) the specific entries it contends were fraudulent or (2) contemplated but not consummated entries that it intends to argue were also part of the alleged scheme.

The government's primary contention is that the summary spreadsheet and more than 6,000 pages of supporting workpapers it produced in discovery, combined with its identification (for the first time, in the appendix to its opposition brief) of fourteen of the supporting workpapers as relevant to particular categories in the summary spreadsheet, obviate the need for a bill of particulars.  But even the limited set of supporting workpapers designated in the appendix are voluminous and extraordinarily complex.  Just one of the fourteen, identified in the appendix as relevant to understanding just one out of nine sub-accounts allegedly involved in the fraud, identifies more than 2,000 different transactions spanning three years.  *See* Second Declaration of Michelle Nicole Diamond in Support of Michael Carroll's Motions to Dismiss the Indictment, for a Bill of Particulars, Motion to Compel Discovery, and Motion to Compel Production of *Brady* Materials ("Second Diamond Decl."), Ex. A (Supporting Workpaper, Adjustments to PY/Retro CAM, WB00453236).

Compounding the issue, the summary spreadsheet and designated supporting workpapers remain both under- and overinclusive.  The defense would have to spend extraordinary resources

to investigate all of the many thousands of accounting entries referenced in them, without any assurance either (1) that each investigated transaction is among the ones the government contends was made with fraudulent intent, or (2) that there are no transactions beyond those listed that will be presented at trial.  That is not fair, and it is precisely the purpose of a bill of particulars to remedy such unfairness.

### A.    The Summary Spreadsheet And Workpapers Are Overinclusive

The defense needs to know *which* accounting entries amongst the thousands listed the government contends were fraudulent (that is, made with intent to defraud).  The government instead offers a very carefully worded representation:  "[A]ll of the adjustments reflected in the Work Papers and Summary Spreadsheet were made necessary as a result of the defendants' fraud."  Opp. 29.  In a conversation on February 5, 2020, we pressed the government to explain the difference between this carefully chosen language and the information the defense had requested—the entries the government contends were fraudulent.  The government declined to represent that there was no difference between what was provided and what was requested, but also declined to explain what the difference was.

As best as we can determine from the very limited information provided, the summary spreadsheets and workpapers do not reflect conclusions about which entries were fraudulent. They reflect instead the entries the audit committee determined were necessary as a result of its investigation, which would include not only allegedly fraudulent entries, but also entries the committee determined were made negligently or by innocent mistake, as well as correct entries that are simply the downstream reflection of other mistaken (or allegedly fraudulent) entries.  In short, the summary spreadsheet and supporting workpapers (even as narrowed to the fourteen listed in the government's appendix) contain many entries the government does *not* contend were fraudulent.  That means these documents are overinclusive.

In *United States v. Bortnovsky*, the Second Circuit found the failure to provide a bill of particulars "impermissibly . . . shifted" the "burden of proof" to the defendants, who were "forced to explain the events surrounding eight actual burglaries" in addition to the four the government argued at trial were staged. 820 F.2d 572, 574-75 (2d Cir. 1987). Here, the over-inclusiveness is many times worse: The overinclusive summary spreadsheet would force the defense to prepare to "explain the events surrounding" not eight but thousands of transactions that the government may not contend were made with intent to defraud. A bill of particulars is necessary.

### B.    The Summary Spreadsheet And Workpapers Are Also Underinclusive

The government concedes that the workpapers and supporting schedules do not include "every single accounting journal entry" the government contends was made with fraudulent intent. Opp. 32. That is an understatement. We examined the audit committee adjustments for one quarter listed in the summary spreadsheet to see how many could be traced back to specific underlying entries. (There is, of course, no way to test the claim that the entry was improper without determining what the specific entry was.) We walk through that process in some detail below so that the Court can understand just how underinclusive the information the government has provided is.

The first tab of the summary spreadsheet ("NOI Adjustments Summary All") identifies (at the highlighted cell below[6]) $2.1 million in adjustments made by the audit committee to reduce same-property net operating income for the fourth quarter of 2013:

---

[6] The highlighting in this and later excerpts does not appear in the documents produced by the government and was added to make the example easier to follow.

| | 3Q2013 | 4Q2013 | 2013 |
|---|---|---|---|
| **Reported Same Property NOI** | | | |
| **Same property NOI** | **192,964,000** | **193,999,000** | **766,684,000** |
| *Property pool changes* | *-* | *(77,000)* | *(323,000)* |
| Y-O-Y change   $ | 6,480,000 | 7,215,000 | 29,304,000 |
| % | **3.5%** | **3.9%** | **4.0%** |
| **Audit Committee Investigation Adjustments to Same Property NOI** | | | |
| Same property revenues | 1,634,502 | (1,842,077) | (93,570) |
| Same property oper. expenses | - | 307,424 | 228,844 |
| Increase (decrease) in same property NOI | 1,634,502 | (2,149,501) | (322,415) |

*See* ECF No. 54-4 at 1.  That cell is in turn derived from the two cells above it—corresponding to adjustments decreasing same-property revenues by $1,842,077 and increasing same-property operating expenses by $307,424.  However, this tab does not explain what entries make up these amounts.  Formulas embedded in the spreadsheet indicate that those two amounts are derived from the cells we have highlighted below in the "AC Adj." tab of the summary spreadsheet (the yellow highlights relate to income items, and the green to expense items):

| AC investigation adjustments Dr/(Cr) | | | 3Q2012 | 4Q2012 | 2012 | 1Q2013 | 2Q2013 | 3Q2013 | 4Q2013 |
|---|---|---|---|---|---|---|---|---|---|
| Main | Base rent | AMR | | | - | | - | (11,750) | (59,708) |
| Main | Other Rev | MISC | | | - | (168,000) | - | (2,055,598) | 1,293,266 |
| Main | Oper Exp | OpExp | | | - | - | - | - | 187,850 |
| ADJ | Base rent | AMR | | | - | - | - | - | - |
| ADJ | Other Rev | MISC | | | - | 5,287 | - | 76,224 | 316,370 |
| ADJ | Expense Reimbursements | EXP | | | - | - | 85,709 | - | - |
| ADJ | Oper Exp | OpExp | | | - | (78,580) | - | - | 119,574 |
| LATE | Late fee | MISC | | | - | | | | |
| RETRO | Prior year CAM | EXP | | | - | - | - | (47,339) | (116,701) |
| CAM | CAM reconciliations | EXP | | | - | 13,000 | 8,000 | (4,000) | 4,000 |
| RET | RET reconciliations | EXP | | | - | (3,000) | (55,000) | 45,000 | 43,000 |
| UC | Tenant deposits reconciliations (UC | MISC | | | | | | | |
| UC | Tenant credits (UC) | MISC | | | - | - | - | 362,961 | 361,850 |
| | Lease settlements | LSI | (604,518) | (604,518) | (364,286) | 228,343 | 134,302 | 604,746 |
| Main | G&A Expenses | G&A | | | - | - | - | - | - |
| | | | | | | | | | |
| | Net (Increase) / decrease to earnings | | - | (604,518) | (604,518) | (595,579) | 267,052 | (1,500,200) | 2,754,247 |
| | | | | | | | | | |
| **Supplemental Discl.** | | | | | | | | | |
| | Base rent | AMR | - | - | - | - | - | 11,750 | 59,708 |
| | Lease settlements | LSI | - | 604,518 | 604,518 | 364,286 | (228,343) | (134,302) | (604,746) |
| | Ancillary and other | MISC | - | - | - | 162,713 | - | 1,616,413 | (1,971,486) |
| | Expense reimbursements | EXP | - | - | - | (10,000) | (38,709) | 6,339 | 69,701 |
| | | | | | | | | | |
| **Revenues - increase (decrease)** | | | | | | | | | |
| | Rental Income | | - | 604,518 | 604,518 | 526,999 | (228,343) | 1,493,861 | (2,516,524) |
| | Expense reimbursements | | - | - | - | (10,000) | (38,709) | 6,339 | 69,701 |
| **Expenses - increase (decrease)** | | | - | 604,518 | 604,518 | 516,999 | (267,052) | 1,500,200 | (2,446,823) |
| | BD Exp - Same prop. operating expen | OpExp | - | - | - | (78,580) | - | - | 307,424 |
| | Lgl - Operating expenses | G&A | - | - | - | - | - | - | - |
| | | | | | | | | | |
| | Increase (decrease) in same property NOI | | - | - | - | 231,293 | (38,709) | 1,634,502 | (2,149,501) |

*See id.* at 5.  Formulas in these cells show these numbers are in turn derived from other numbers in the same tab as illustrated below (the arrows and highlighting show the cells in the top half that are the constituents of the same colored cells in the lower half):

| AC investigation adjustments Dr/(Cr) | | | 3Q2012 | 4Q2012 | 2012 | 1Q2013 | 2Q2013 | 3Q2013 | 4Q2013 |
|---|---|---|---|---|---|---|---|---|---|
| Main | Base rent | AMR | | | - | - | | (11,750) | (59,708) |
| Main | Other Rev | MISC | | | - | (168,000) | - | (2,055,598) | 1,293,266 |
| Main | Oper Exp | OpExp | - | | - | - | - | - | 187,850 |
| ADJ | Base rent | AMR | - | | - | - | - | - | - |
| ADJ | Other Rev | MISC | - | | - | 5,287 | - | 78,224 | 316,370 |
| ADJ | Expense Reimbursements | EXP | - | | - | 85,709 | | - | - |
| ADJ | Oper Exp | OpExp | - | | - | (78,580) | - | - | 119,574 |
| LATE | Late fee | MISC | - | | - | - | - | - | - |
| RETRO | Prior year CAM | EXP | - | | - | - | - | (47,339) | (116,701) |
| CAM | CAM reconciliations | EXP | - | | - | 13,000 | 8,000 | (4,898) | 4,000 |
| RET | RET reconciliations | EXP | - | | - | (3,000) | (55,000) | 45,000 | 43,000 |
| UC | Tenant deposits reconciliations (UC | MISC | - | | - | - | - | - | - |
| UC | Tenant credits (UC) | MISC | - | | - | - | - | 362,968 | 361,850 |
| | Lease settlements | LSI | (604,518) | | (604,518) | 364,286 | 228,343 | 134,302 | 604,746 |
| Main | G&A Expenses | G&A | - | | - | - | - | - | - |
| | Net (Increase) / decrease to earnings | | - | (604,518) | (604,518) | 595,579 | 267,052 | (1,500,200) | 2,754,247 |
| | | | | | | | | | |
| | **Supplemental Discl.** | | | | | | | | |
| | Base rent | AMR | - | - | - | - | | 11,750 | 59,708 |
| | Lease settlements | LSI | - | 604,518 | 604,518 | 364,286 | (228,343) | (134,302) | (604,746) |
| | Anciliary and other | MISC | - | - | - | 162,713 | - | 1,616,413 | (1,971,486) |
| | Expense reimbursements | EXP | - | - | - | (10,000) | (38,709) | 6,339 | 69,701 |
| | **Revenues** - increase (decrease) | | | | | | | | |
| | Rental Income | | - | 604,518 | 604,518 | 526,999 | (228,343) | 1,493,861 | (2,516,524) |
| | Expense reimbursements | | - | - | - | (10,000) | (38,709) | 6,339 | 69,701 |
| | | | - | 604,518 | 604,518 | 516,999 | (267,052) | 1,500,200 | (2,446,823) |
| | **Expenses** - increase (decrease) | | | | | | | | |
| | BD Exp - Same prop. operating exper | OpExp | - | - | - | (78,580) | | | 307,424 |
| | Lgl - Operating expenses | G&A | - | - | - | - | - | - | - |
| | **Increase (decrease) in same property NOI** | | - | - | - | 231,293 | (38,709) | 1,634,502 | (2,149,501) |

*See id.*  But this is just category information.  There is no way to tell from the summary spreadsheet which specific income and expense items within each category the government believes should (or should not) have been recorded in this quarter, but instead were (or were not) recorded in some other quarter.  There is no way to defend against such allegations—that is, to attempt to show that the various expense and income items were recorded at the proper time—without knowing the specific expense and income items at issue.

Indeed, three of the highlighted numbers—Base Rent ($59,708), Tenant Credits ($361,850) and Other Rev ($316,370)—do *not* appear in the fourteen supporting workpapers identified by the government.  In a call on February 5, 2020, we asked the government to identify the support for these three numbers.  The government today provided an "answer" to that question, which raised still further questions.  For example, some of the unexplained numbers are represented to be the sums of multiple cells in various supporting workpapers, although there are *no* indications in those workpapers that these numbers should be summed.  And these new cells still do not all tie back to specific transactions.  The $316,370 "other revenue" item is, we are told, the sum of the three numbers highlighted in orange in the workpaper below:

| | | | PBC | | | | | Marks Paneth Testing Coverage | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Total | Unvouched PO (1) | Bal sheet Clean up | PRT Income (2) | Bankruptcy Proceeds | Lease Term | Misposting RCAM/RRET | Selected for testing | Coverage | Transactions tested | Coverage |
| 12/31/2012 | Balance | (526,120.30) | (197,942.91) | - | (18,628.66) | (309,548.73) | | | | | | |
| | | | | | | | | | | | | |
| Q1 2013 | | (100,463.95) | (210.00) | 5,286.53 | (25,703.18) | | (78,579.64) | (1,257.66) | (73,293) | 73% | (73,293) | 100% |
| 3/31/2013 | Balance | (626,584.25) | (198,152.91) | 5,286.53 | (44,331.84) | (309,548.73) | (78,579.64) | (1,257.66) | | | | |
| | | | | | | | | | | | | |
| Q2 2013 | | 43,205.71 | 658.71 | 85,709.33 | (43,162.33) | - | | - | 85,709 | 198% | 85,709 | 100% |
| 6/30/2013 | Balance | (583,378.54) | (197,494.20) | 90,995.86 | (87,494.17) | (309,548.73) | (78,579.64) | (1,257.66) | | | | |
| | | | | | | | | | | | | |
| Q3 2013 | | | | | | | | | | | | |
| Adj sub ledger balance | | (1,654.61) | (1,654.61) | | | | | | | | 12 | |
| Balance sheet clean up | | 14,270.75 | | 14,270.75 | | | | | 14,271 | | 14,271 | 100% |
| Percentage rent income | | 35,270.00 | | | 35,270.00 | | | | | | 20,270 | |
| Bankruptcy proceeds | | (209,230.41) | | | | (209,230.41) | | | (209,230) | | (209,230) | 100% |
| Recorded as income | | 143,109.44 | | | | 143,109.44 | | | 143,109 | | 101,893 | 71% |
| RCAM/RRET misposting | | 9,175.47 | | | | | | 9,175.47 | | | | |
| R/C to income | | 128,074.00 | 128,074.00 | | | | | | 128,074 | | 21,846 | 17% |
| 9/30/2013 | Balance | (464,363.90) | (71,074.81) | 105,266.61 | (52,224.17) | (375,669.70) | (78,579.64) | 7,917.81 | 76,224 | 64% | | |
| | | | | | | | | | | | | |
| Q4 2013 | | - | - | | | | | | | | | |
| Balance sheet clean up | | 119,573.53 | | 119,573.53 | | | | | 119,574 | | 135,431 | 113% |
| Percentage rent income | | 52,224.17 | | | 52,224.17 | | | | | | | |
| R/C to income | | 375,669.70 | | | | 375,669.70 | | | 375,670 | | 552,363 | 147% |
| Lease term to income | | 78,579.64 | | | | | 78,579.64 | | 78,580 | | 78,580 | 100% |
| r/c to income | | (145,796.84) | 86,961.11 | (224,840.14) | | | | (7,917.01) | (137,879) | | (176,115) | 128% |
| 12/31/2013 | Balance | 15,886.30 | 15,886.30 | - | - | - | - | - | 435,944 | 91% | | |

The third of those numbers, ($137,879), is in turn the sum of the two numbers highlighted in yellow.  But those two numbers—the end of the trail as far as we can tell—are just numbers in a spreadsheet, not tied to any specific transaction or transactions.[7]  In short, the impenetrable nesting spreadsheets

---

[7] We raised this issue with the government today, and they indicated they would be unlikely to get back to us before our brief is due.

the government has produced are simply not workable.  Its offer to answer questions is no substitute for what is needed:  a list of the transactions the government contends are fraudulent.

For two other categories—CAM Reconciliations ($4,000) and RET Reconciliations ($43,000)—the workpapers reveal that the government's forensic experts did not even try to identify specific incorrect entries.  Instead, they estimated—based on activity at *one* property— that 50% of the amounts recorded in total in these categories should have been recorded in the prior month and applied that estimate (with no further analysis of whether that property was representative) across all 500 properties Brixmor owned for the full time period of the alleged fraud, generating more than $1.5 million in entries that do not tie to any specific transactions. *See generally* Second Diamond Decl., Ex. B (Memorandum, Adjustments for Recognition of CAM Reconciliation Income, WB00689838-40).

This kind of information is simply not good enough.  The defense cannot be left to guess at which specific income and expense items the government contends were fraudulently recognized in the wrong quarters.  With knowledge of the specific items, the defense can prepare to challenge the government's accounting judgments, which may well turn on precise facts about the specific transactions.[8]  Without workpapers that connect each adjustment back to the underlying transactions, there is no way to test the government's judgments.  The government should be required to provide the particulars and should be precluded from proving any specific income or expense item not thus identified.

---

[8] For example, whether a particular construction expense counts against SS-NOI might depend on whether it is a capital or operating expense, which in turn might depend on whether particular construction work was more like recurring maintenance (operating expense, included in SS-NOI) or new building (capital expense, excluded).

### C. None Of The Other Materials The Government Cites Solves The Problem

#### 1. The Indictment does not adequately specify the charges against Mr. Carroll

The government argues that the "lengthy speaking Indictment" provides "great detail" about the charges. Opp. 24-25. But the indictment identifies only a handful of examples out of the *thousands* of entries the government concedes are at issue. That is not sufficient to enable Mr. Carroll to prepare his defense.

#### 2. The government's disorganized discovery is not an adequate substitute to a bill of particulars

The government also touts what it describes as its "organized" discovery in this case. Opp. 19-20. But nothing in the discovery provides the needed information: all the entries the government claims were fraudulent. And the government's description of the discovery is generous, at best. Many of the produced documents are not searchable by the Bates number that appears on the face of the document, and many are missing custodian information, attachments, and metadata such as whether the emails were opened. *See, e.g.*, ECF No. 28 (Hearing Tr., Nov. 5, 2019) at 3-8 (counsel for Mr. Carroll describing technical difficulties with discovery).

#### 3. A bill of particulars is necessary to enable Mr. Carroll to prepare a defense related to unconsummated accounting entries

Nothing in the Indictment, discovery, or workpapers provides Mr. Carroll with the information necessary to prepare his defense regarding unconsummated accounting entries (beyond the few examples in the Indictment) that the government may contend at trial would have been fraudulent if made. *See* ECF No. 53 (Carroll Mem. in Supp. of Mot. for Bill of Part.) ("BOP Mem.") at 14-15. The government construes Mr. Carroll's request as a "request for a list of the topics of coconspirators' conversations in furtherance of the scheme, i.e., overt acts." Opp. 33. That is not what Mr. Carroll seeks. His request is much narrower, seeking only a list

of the specific unconsummated accounting entries that the government contends were discussed and would have been fraudulent if made.

If the government intends to prove fraud at trial by relying on conversations about potential accounting decisions that were never consummated, Mr. Carroll is entitled to know in advance which entries are at issue. Evaluating the accounting treatment of specific items many years ago is a complex task, one that Mr. Carroll cannot be required to undertake in the middle of trial.

Absent such notice, Mr. Carroll would be placed in the impossible position of either going into trial unprepared or attempting to analyze every conversation concerning the appropriate accounting for Brixmor's nearly 500 properties—nearly all of which he is not copied on—and determining whether there is a basis for the government to argue that, had the discussed entry been made, it would have been improper. A bill of particulars is necessary to enable Mr. Carroll to prepare his defense regarding these unconsummated entries.

### D.      Case Law Supports Mr. Carroll's Motion For A Bill Of Particulars

The government's opposition ignores clearly applicable case law supporting a bill of particulars, hiding behind the argument that "all fraud is 'transaction-based.'" Opp. 35. But courts routinely grants bills of particulars where, as here, defense counsel is left "unguided as to which documents [or entries] would be proven falsified," *Bortnovsky*, 820 F.2d at 575, and where the alleged "long-running fraud scheme [is] based on the cumulative effect of many acts" that took place years ago. Opp. 36; *see also, e.g.*, *United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001) (ordering bill of particulars so defendant would not have to "attempt to guess which of the numerous transactions documented therein, and conducted over a six-year period, are alleged by the government to have been improper"). The government next attempts to distinguish the insider-trading cases cited in Mr. Carroll's brief (BOP Mem. 7-9), because there the "charges necessarily center[] on the substance and timing of

particular alleged tips," Opp. 35, but it fails to acknowledge that the alleged fraud here involves

the "substance and timing" of the recognition of certain income line items.

Moreover, the fact that a bill of particulars was rejected in *United States v. Block* does not

dictate the outcome here.  *See* Opp. 35.  *Block* involved a single alleged misrepresentation about

one metric (which also affected a related metric), in one disclosure, and the indictment provided

ample detail about the alleged misrepresentation.  2017 WL 1608905, at *1-2, *6.  Here, by

contrast, neither the Indictment nor the government's proposed substitutes for a bill of particulars

identifies all the allegedly fraudulent transactions that the government intends to rely on at trial.

And the other cases cited by the government support Mr. Carroll by declining to order bills of

particulars because the government provided precisely the type of information that Mr. Carroll

seeks.  *See* Opp. 21; BOP Mem. 11; *see also United States v. Cuti*, No. 08 Cr. 972 (DAB), 2009

WL 3154310, at *8 (S.D.N.Y. Sept. 24, 2009) (no bill of particulars necessary when government

produced a list of "[t]ransactions that the Government alleges are fraudulent"), *aff'd*, 528 F. App'x

84 (2d Cir. 2013); *United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *1

(S.D.N.Y. Jan. 23, 2009) (no bill of particulars needed when indictment identified the four specific

fraudulent loans at issue).  The government has declined to provide that information here.

### E.   Early Identification Of The Accounting Entries At Issue Will Not Unduly Constrain The Government At Trial

Finally, the government argues that providing the requested bill of particulars would

"force the Government to produce a binding exhibit list far in advance of trial," Opp. 39—but

that is not what Mr. Carroll seeks.  He merely asks that the government "identify a manageable

subset within the universe of data that is actually relevant to the courtroom presentation of this

case."  *United States v. Connolly*, No. 16 Cr. 370 (CM), 2017 WL 2537808, at *5-7 (S.D.N.Y.

May 24, 2017) (imposing a "cut-off date" after which the government could not add additional

trades to the list of trades at issue without making a showing of good cause); *see also United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *7 (S.D.N.Y. May 28, 2013) (requiring early disclosure of exhibits and exhibit lists in light of the volume of documents), *aff'd in part*, 646 F. App'x 73 (2d Cir. 2016).  The government cannot realistically intend to prove to the jury that each one of these thousands of individual entries was fraudulent and should therefore be required to identify a subset of those thousands of entries that it may choose to prove at trial.

### III.    Mr. Carroll's Motion To Compel Production Of *Brady* Materials Should Be Granted

#### A.    The Government Should Produce The Requested Material From *Block*

The government told the jury in *Block* that adjusted funds from operations ("AFFO") was the "the single most important financial measure" to REITs.  But the government has refused to search its files from *Block* for the bases for that representation.

The government denies any logical relationship between the importance of AFFO and the materiality of errors in SS-NOI.  Opp. 54-55.  But if SS-NOI were the *most* important metric for REITs, one can be sure the government would trumpet that fact as supporting materiality here (just as it did in *Block*).  The jury must assess whether the adjustments in SS-NOI would have "assumed disproportionate significance for investors" such that the "total mix of information" available to investors was significantly altered.  *Dekalb*, 2016 WL 3685089, at *4.  That standard necessarily involves comparing the alleged misstatement to everything else that was accurately disclosed.  If the *most* important metric was disclosed accurately, that surely decreases the likelihood that the misstatement of less important information was material.

The government also suggests that permitting this request would require the government "to scour the files of every litigated or investigated instance in which [other] measures of performance were ever shown to be material."  Opp. 55.  Not so.  The government did not merely say in *Block* that AFFO was "material" (a statement that would imply little about the relative

importance of other metrics).  It said it was the single *most* important metric, an assertion that decreases the possibility that the small discrepancies in SS-NOI, a necessarily less important metric, would be material.  And we are not suggesting that the government's *Brady* obligations typically run to other cases.  But where the defense identifies the other case, the government has access to the other case's files, and the defense demonstrates clear reasons to believe exculpatory information will be found based on the government's statements at trial, *Brady* requires the government to look.  *See United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("To the extent that the prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant.").

Finally, the government asserts that "any arguments made in *Block* about the role or import of AFFO were based on the public records in that case which are readily and easily accessible to Carroll."  Opp. 55.  But the government cannot possibly know that, since it has refused to review its own, non-public *Block* files to see whether they shed light on the bases for the arguments made beyond what is in the public record.  And information in those files about the reasons AFFO is the most important metric could certainly be materially exculpatory.  For instance, if analysts told the government that AFFO was the "most important" financial metric to REIT investors for reasons that are not applicable to SS-NOI, that would substantially fortify the defense's materiality argument.   The Court should direct the government to review the *Block* files.

**B.    The Government Should Review The SEC's Full Investigative File**

The government argues it is not required to review evaluative documents in the SEC's investigative file because the government did not conduct a joint investigation with the SEC and because such deliberative documents "do not generate *Brady* material."  Opp. 52.  The government is wrong on both counts.

21

The government contends that it and the SEC "made independent decisions" about charges and investigative actions.  But the dispositive question is whether the government and the SEC engaged in joint fact-gathering.  *See United States v. Gupta*, 848 F. Supp. 2d 491, 494 (S.D.N.Y. 2012).  They did.  As explained in Mr. Carroll's opening brief, the government relied almost entirely on the documents collected by the SEC.  The government made only a few additional supplementary requests for documents.  And the SEC and the government conducted several joint interviews with key individuals, including Brixmor employees and investors, and jointly participated in an April 2019 presentation on behalf of Mr. Carroll.  The SEC and the government issued simultaneous charging documents and press statements, further confirming the extent of their close coordination.

Nor does the government's agreement to review other materials, such as testimony, proffers, or witness statements, obviate the need for review of the SEC's assessment and evaluation documents.  *See id.* at 495 ("[W]here the investigation is conducted jointly, the Government is charged with reviewing *all* documents and information connected to that joint investigation and disclosing any exculpatory information." (emphasis added)).  As explained in Mr. Carroll's opening brief, such materials may reference exculpatory facts not disclosed elsewhere.  The government's only response is to relay the SEC's representation that the SEC's assessment and evaluation materials "would not be the source of facts not otherwise identified in the materials the Government has already reviewed."  Opp. 51.  But that is just misdirection; the claim is not that the memos would be the "source" of facts, but that they would *reflect* facts not captured elsewhere.  The subjunctive nature of the representation (the materials "would not be the source") suggests that the SEC has merely described to the government its general practice, rather than reviewing the actual memos in question and confirming that they do not include exculpatory

facts beyond those identified in the materials already shared.  And of course, the views of SEC

officials may *themselves* be exculpatory facts, as a jury might find highly relevant an SEC

official's doubts about materiality. The government asserts that this is not so, but its argument is

devoid of citation and does not even attempt to distinguish the case we cited in support.  *See*

*United States v. Kohring*, 637 F.3d 895, 907-08 (9th Cir. 2011).  The government should be

directed to review the SEC's assessment and evaluation materials.

**IV.     Mr. Carroll's Motion To Compel Discovery Should Be Granted**

As explained in Mr. Carroll's opening brief, interference or intrusion into the "legal camp

of the defense" may violate the Sixth Amendment.  *United States v. Mosca*, 475 F.2d 1052, 1060

(2d Cir. 1973).  To protect Mr. Carroll's constitutional rights, the government was required to

ensure it did not elicit from Mr. Splain information about privileged communications with Mr.

Carroll.  It was further required to instruct Mr. Splain not to learn such information in his

ongoing interactions with Mr. Carroll.  Such instructions were particularly necessary here, as the

government must have known that, at the time it was trying to recruit Mr. Splain as a cooperating

witness, Mr. Splain was working for Mr. Carroll's company and so was in regular contact with

Mr. Carroll.  The government did not give the required instructions at the outset of its

relationship with Mr. Splain, and as a result, Mr. Splain shared at least three alleged

conversations with Mr. Carroll about issues plainly within the scope of a common interest

agreement.  To assess the extent of any Sixth Amendment violations, Mr. Carroll requires the

government's notes of its interviews with Mr. Splain.

In response, the government principally argues that Mr. Splain's disclosures are no basis

for concern because two of the alleged conversations (in February 2019) were allegedly

"initiated by Carroll" and because Splain "effectively shut[] down the conversation[s]."  Opp. 43.

To support these representations, the government offers only a few lines of handwritten notes,

dated well after the February 2019 conversations allegedly occurred, from a discussion not with Mr. Splain, but with his lawyer.  As explained in Mr. Carroll's opening brief, these notes support only portions of the government's account.  *See* ECF No. 44 (Carroll Mem. in Supp. Mot. to Compel) at 4-5.  The government simply fills in important blanks (e.g., who initiated the second conversation, whether Mr. Splain shut down the conversation) with its own omniscient narration, untethered to any evidence.  The government has provided no basis—such as an affidavit from Mr. Splain, or from an interviewing agent, or excerpts of notes of an interview of Mr. Splain—to substantiate its self-serving explanation.

The government offers an even sparser record as to the third alleged communication. The government's initial disclosure indicated only that at some unknown time "following the whistleblower's allegations [in December 2015]," Mr. Carroll allegedly told Mr. Splain that "it was Pappagallo's fault based on Pappagallo's emails and spreading a culture of jokes and looseness."  Opp. 40.  The government now purports to date that alleged conversation to the "weeks following the whistleblower complaint" and "before the filing of the civil case in March 2016," *id.* at 45, in order to predate Mr. Carroll and Mr. Splain's common interest understanding in connection with that case.  But the government offers only its own "understand[ing]" to support that dating.  It has not provided an affidavit from Mr. Splain, or any report or notes of communications with Mr. Splain.  On this record, the government has not rebutted the strong inference that Mr. Splain told the government about three alleged conversations within the scope of his common interest agreement with Mr. Carroll.

The government concedes that it did not instruct Mr. Splain at the outset not to seek information from Mr. Carroll about privileged communications or Mr. Carroll's defense strategy, claiming only that it gave appropriate instructions (which it declines to document) after learning

24

of the alleged February 2019 conversations.  It argues that prior to learning of these alleged

discussions, it "had no reason to think that Splain . . . was in any way involved with Carroll's

lawyers." *Id.*  That is simply not credible.  The government surely knew that Mr. Carroll and

Mr. Splain were co-defendants in a pending civil securities class action related to the very events

the government was investigating, and common interest understandings are routine among

defendants in such cases.  And the government also surely knew Mr. Carroll and Mr. Splain were

in regular contact, since they worked together after leaving Brixmor.  Under these circumstances,

the government had a clear obligation to caution Mr. Splain at the outset but did not do so.

Finally, the government asserts that 18 U.S.C. § 3500 bars the relief Mr. Carroll seeks at

this stage.  But the Sixth Amendment rights at stake trump any statutory bar on the disclosure of

witness statements.[9]  *See United States v. Coppa*, 267 F.3d 132, 145-46 (2d Cir. 2001) (noting

that constitutional requirements supersede the Jencks Act because it is "axiom[atic] . . . that the

requirements of the Constitution prevail over a statute in the event of a conflict").

The Court should order disclosure of the notes of the government's interviews of Mr.

Splain, so that the full scope of any Sixth Amendment violation can be assessed and an

appropriate remedy fashioned.

## CONCLUSION

For the foregoing reasons, and for the reasons stated his opening briefs, Mr. Carroll's

motions should be granted.

---

[9] It is irrelevant that the alleged intrusion occurred pre-indictment.  As the Second Circuit has explained, "[w]hen the government acts prior to indictment so as to impair the suspect's relationship with counsel post-indictment, the pre-indictment actions ripen into cognizable Sixth Amendment deprivations upon indictment."  *United States v. Stein*, 541 F.3d 130, 153 (2d Cir. 2008).

Dated: New York, New York
       February 7, 2020

Respectfully submitted,

/s/ Peter G. Neiman
PETER G. NEIMAN
ANJAN SAHNI
MICHELLE NICOLE DIAMOND
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

WILLIAM R. MCLUCAS
BRENDA E. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

*Counsel for Michael Carroll*