UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————— x

UNITED STATES OF AMERICA,

     -against-

MICHAEL CARROLL and
MICHAEL PAPPAGALLO,

          Defendants.
———————————————————————————— x



19 CR 545 (CM)

## DECISION AND ORDER ON DEFENDANTS' PRETRIAL MOTIONS

McMahon, C.J.:

Michael Carroll and Michael Pappagallo are charged with conspiracy to commit various

securities offenses, as well as actual substantive violations of securities law. The matter is in the

pretrial motions stage—no trial date has been set.

Before the Court are defendants respective motions to (1) dismiss the Indictment, (2) be

provided with a bill of particulars, (3) compel early production of certain materials regarding a

government witness, and (4) require the Government to review its files from an unrelated criminal case

that was tried in this district in 2017 and the U.S. Securities and Exchange Commission's ("SEC") files

in a civil investigation of Brixmor Property Group Inc. ("Brixmor").

## BACKGROUND

On July 30, 2019, the Indictment in this matter was unsealed, charging defendants Michael

Carroll and Michael Pappagallo in six counts. The allegations in the Indictment relate to an

accounting fraud scheme involving Carroll, Pappagallo, and others to fraudulently manipulate certain

financial metrics contained in the public filings of Brixmor, a publicly traded real estate investment

1

trust ("REIT").

 *Count One* of the Indictment charges Carroll and Pappagallo with participating in a conspiracy to commit securities fraud, and to make false filings with the SEC, in violation of Title 18, United States Code, Section 371. *Count Two* charges both defendants with the substantive crime of securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2. *Counts Three and Four* charge Carroll and Pappagallo with the substantive crime of making false statements in specific filings with the SEC—Brixmor's Form 10-Q filing for the Third Quarter of 2014 and its Form 10-Q filing for the Second Quarter of 2015, respectively—in violation of Title 15, United States Code, Sections 78m(a) and 78ff, Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-13 and Title 18, United States Code, Section 2. *Counts Five and Six* charge Carroll and Pappagallo with filing false certifications of disclosure with the SEC related to the 10-Q disclosures at issue in Counts Three and Four, respectively, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, Title 17, Code of Federal Regulations, Section 240.13a-14, and Title 18, United States Code, Section 2.

 According to the Indictment, Brixmor generated profit and shareholder returns based on the performance of underlying real estate assets. Like other publicly traded REITs, Brixmor measured its performance through metrics besides, or in addition to, traditional GAAP measurements of company performance. (Indictment ¶ 9). One such non-GAAP metric was Same Store Net Operating Income ("SS-NOI"), which measured net operating income solely with respect to properties owned by the REIT in both the current reporting period and the same period during the prior year, hence the terminology of "Same Store." (Indictment ¶ 10). That way, the company could track performance without the distorting effects of properties that had been acquired or sold during the relevant period,

developments that affect income across the company but may have little to do with how well Brixmor's properties are performing. SS-NOI can be expressed as an absolute number, but it can be and often is expressed as a percentage that compares the relative increase or decrease between the current reporting period and the prior reporting period. This metric is referred to herein as SS-NOI Growth, a metric Brixmor chose to emphasize in its public filings and messages to the investing public. (Indictment ¶¶ 10, 16-17).

Although REITs like Brixmor are not required by the SEC to calculate or report SS-NOI or SS-NOI Growth, Brixmor and other REITs nevertheless reported SS-NOI Growth in its periodic filings with the SEC and in related public disclosures. (Indictment ¶ 12). Brixmor described SS-NOI Growth as "a key metric used by analysts and investors to evaluate a REIT's financial performance," including Brixmor's specifically. (*Id.*). Brixmor also released to the investing public forward-looking forecasts of its expected annual SS-NOI Growth for each calendar year. Each of Brixmor's 10-Qs and 10-K financial disclosures during the period of time relevant to the Indictment included a definition regarding how Brixmor calculated SS-NOI (and thus SS-NOI Growth) – a definition that specifically excluded from the calculation "lease termination income" or "lease settlement income" ("LSI"), one-time payments made by a tenant for early termination of a lease. (Indictment ¶ 11).

During the time period relevant to the charges alleged in the Indictment, Carroll served as Brixmor's Chief Executive Officer and Pappagallo as its Chief Financial Officer. (Indictment ¶¶ 1-3). Carroll and Pappagallo, along with Chief Accounting Officer Steven Splain and others, participated in a scheme in which they caused Brixmor to report fraudulently "smoothed" SS-NOI Growth numbers – that is, falsely inflated and deflated so as to present a pattern of steady and consistent growth from quarter to quarter that consistently fell within the year's forecasted range for SS-NOI Growth, rather than the actual more volatile activity. (Indictment ¶ 15). On a quarterly

3

basis, the defendants and their co-conspirators manipulated the reported SS-NOI Growth in three principle ways: (1) engaging in "cookie jar" accounting by illicitly storing certain income when it should have been immediately recognized, (2) including LSI in the SS-NOI calculations despite the company's representations that LSI was excluded, and (3) fraudulently removing income and/or properties from SS-NOI in the prior relevant comparison period so as to selectively make the current period's growth appear larger. (Indictment ¶ 21).

During the period Brixmor's SS-NOI figures were being manipulated, company representatives—including the defendants—touted Brixmor's consistent quarter-to-quarter SS-NOI Growth performance results. In industry events and on investor calls, Carroll and Pappagallo regularly promoted Brixmor as an investment opportunity based on its pattern of smooth, steady growth, typically illustrated through use of the SS-NOI Growth metric and its quarterly conformity to the firm's annual projections. (Indictment ¶ 11).

The fraudulent scheme led to Brixmor's reporting fraudulent SS-NOI Growth numbers to the SEC and the investing public in all, but one of the nine quarterly periods implicated over the duration of the conspiracy, representing alterations to SS-NOI Growth Numbers that were significant. (*See* Indictment ¶ 33 (chart)).

## I.    DEFENDANTS' MOTIONS TO DISMISS

Defendants' motions to dismiss the federal indictment are for all in intents and purposes exercises in futility.

On a pretrial motion to dismiss pursuant to Fed. R. Crim. 12(b), the allegations of the indictment must be taken as true. *See Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337, 343 n.16 (1952); *United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).   It is well settled that

"[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits." *Costello* v. *United States*, 350 U.S. 359, 365 (1956). A defendant must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict before contesting the sufficiency of the evidence. *See* Fed. R. Crim. P. 29; *see also United States* v. *Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997); *United States* v. *Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992).

Rule 7(c) of the Federal Rules of Criminal Procedure provides that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). In general, to satisfy the pleading requirements, "'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *United States* v. *Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *United States* v. *Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)). "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States* v. *Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (quoting *United States* v. *Stavroulakis*, 952 F.2d at 693) (internal quotation marks omitted). Indeed, the dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States* v. *De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted). When determining whether or not a count sufficiently alleges a violation, the indictment should be read "in its entirety." *United States* v. *Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992).

Here, the 30-plus page Indictment sets forth in plain language how and when defendants

5

conspired to make false statements to, and filings with the SEC, as well as how and when they actually committed the substantive crimes of securities fraud, making false statements to the SEC, and making false certifications to the SEC. *See* Indictment at 1-30, *passim*. There is more than sufficient detail in the Indictment to allow the defendants to defend against the charges in the present prosecution, and—should they ever find themselves in the unhappy position of having to defend themselves against a future prosecution for the same offenses—to plead double jeopardy. That is all that is required for an indictment to be legally valid. *See United States* v. *Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) ("It is well settled that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." (internal quotation marks and citation omitted)).

Ignoring the minimal pleading requirement for indictments under Rule 7(c), defendants nevertheless insist that the Indictment be dismissed. They contend that—even if you accept as true the allegation in the Indictment that defendants manipulated Brixmor's SS-NOI figures—the difference alleged in the Indictment between what should have been reported as the company's "true" SS-NOI and the "false" SS-NOI calculations defendants reported was so *de minimus* that no investor would have found the difference to be material to his or her investing decision. Therefore, defendants' argue, the Government could never satisfy the materiality element for the charged crimes.

The standard governing the assessment of materiality in securities fraud cases is set forth in two Supreme Court cases, *TSC Industries, Inc.* v. *Northway, Inc.,* 426 U.S. 438 (1976), and *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988). Together, these cases stand for the proposition that a fact is material if it "is one that would have been significant to a reasonable investor's investment decision."

6

Materiality determinations are an "inherently fact-specific finding." *Basic* v. *Levinson*, 485 U.S. at 236. "Materiality" is the same in both the civil and criminal context. *See United States* v. *Gleason*, 616 F.2d 2, 28 (2d Cir. 1979) ("It is also settled that the same standards apply to civil and criminal liability under the securities law."); *United States* v. *Causey*, No. CRIM. H-04-025-SS, 2005 WL 2647976, at *2 (S.D. Tex. Oct. 17, 2005) ("The definition and scope of 'materiality' are the same in both civil and criminal contexts.").

Courts have repeatedly emphasized that quantitative materiality thresholds are merely a starting point for materiality analysis, and that both qualitative and quantitative factors must be considered to properly assess materiality. *See Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) ("[W]e have consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation."); *Litwin* v. *Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) ("[A] court must consider both quantitative and qualitative factors in assessing an item's materiality and that consideration should be undertaken in an integrative manner.") (internal citation and quotation marks omitted).

The Second Circuit has endorsed the use of the SEC's Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999) ("SAB 99"), issued on August 12, 1999, as persuasive authority in determining materiality. *See Ganino*, 228 F.3d at 163-64 ("[B]ecause SEC staff accounting bulletins 'constitute a body of experience and informed judgment,' and SAB No. 99 is thoroughly reasoned and consistent with existing law – its non-exhaustive list of factors is simply an application of the well-established *Basic* analysis to misrepresentations of financial results – we find it persuasive guidance for evaluating the materiality of an alleged misrepresentation." (internal citation omitted)). In SAB 99, the SEC's accounting staff stated that the "use of a percentage as a numerical threshold,

such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation less than the specific percentage with respect to a particular item on the registrant's financial statements is unlikely to be material." 1999 WL 1123073, at *2.

However, "the magnitude of a misstatement is only the beginning of an analysis of materiality." *Id.* Analyses of percentages "cannot appropriately be used as a substitute for a full analysis of all relevant considerations." *Id.* Instead, materiality assessments require consideration not just of the size of the misstatement, but also the "factual context in which the user of financial statement would view the financial statement item." *Id.* In other words, materiality assessments require consideration of both "quantitative" and "qualitative" factors. *Id.*

In that regard, SAB 99 goes on to note that "a registrant and the auditors of its financial statements should not assume that even small *intentional* misstatements in financial statements, for example those pursuant to actions to 'manage' earnings, are immaterial." *Id.* at *4 (emphasis added). And, although management intent does not necessarily render a misstatement material, "it may provide significant evidence of materiality. The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to 'manage' reported earnings." *Id.* In those instances, management has "presumably" misstated its reported earnings "believing that the resulting amounts and trends would be significant to users of the registrant's financial statements." *Id.*

In SAB 99, the SEC staff stated that "there are numerous circumstances in which misstatements below 5% could well be material" and that "[q]ualitative factors may cause misstatements of quantitatively small amount to be material." *Id.* at *3. SAB 99 provides a non-exhaustive list of qualitative factors that may impact the materiality assessment of quantitatively

8

small misstatements, including "whether the misstatement masks a change in earnings or other trends," "whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise," and "whether the misstatement has the effect of increasing management's compensation." *Id.* Additionally, "the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material." *Id.* Market reaction alone is "too blunt an instrument to be depended on," but when management expects "that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material." *Id.*

Defendants accuse the Government of creating a false impression of materiality by looking at the percentage change in SS-NOI Growth as compared to the same quarter in prior years, "a 'strategy' that "wildly inflates the alleged errors." (Carroll MTD Br. 8). They argue that "the discrepancy between Brixmor's reported and alleged actual SS-NOI numbers are plainly quantitatively immaterial, far less than 1% in most quarters. *See* Carroll MTD at 5-6.

The Government counters that SS-NOI Growth is the metric Carroll and Pappagallo chose to manipulate and the appropriate starting point for calculating the magnitude of any misstatement. The Government says the Indictment alleges facts that spell out a specific and deliberate conspiracy to manipulate that metric.

What defendants' motions have done is frame what will no doubt be a central issue in this case: the materiality of defendant's alleged misstatements. And since "materiality under

9

the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially 'well suited for jury determination,'" *United States* v. *Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) (quoting *United States* v. *Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991)), that is where the issue will be resolved in this case. Indeed, "only [w]here the misstatements are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance,'" may a court find "the misstatements immaterial as a matter of law." *Litvak*, 808 F.3d at 175 (citation omitted). Defendants have not made that showing here.

The motion to dismiss is denied.

## II. DEFENDANTS' MOTIONS FOR A BILL OF PARTICULARS ARE DENIED.

The Defendants each moved for a bill of particulars, asking the Government to: (1) list all Brixmor accounting entries used by the conspirators in furtherance of the fraudulent scheme; (2) list all Brixmor accounting entries discussed by the conspirators in furtherance of the scheme; (3) explain the Government's theory for why each accounting entry was incorrect (Pappagallo only); and (4) provide early notice of all accounting entries the Government intends to reference at trial (Carroll only). (Dkt. No. 49, 52.) Without this information, the Defendants claim that they are insufficiently informed to prepare themselves for trial, despite the lengthy speaking Indictment and the production of more than 535,000 pages of information, including the results of a detailed forensic accounting investigation into the fraud at issue.

The defendants' requests are an improper attempt to preview the Government's presentation of evidence at trial, and, therefore, the motions are denied.

10

A motion for a bill of particulars should be granted only where necessary (1) to inform the accused of the charges against him with sufficient precision to enable him to prepare his defense and avoid surprise; and (2) to enable the accused to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. *See Wong Tai v. United States*, 273 U.S. 77, 82 (1927); *United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007). A bill of particulars "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States* v. *Kazarian*, No. 10 Cr. 895, 2012 WL 1810214, at *24-*26 (S.D.N.Y. May 18, 2012). Instead, a "bill of particulars is 'required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1990). Defendants must recognize that "the law does not impose upon the Government an obligation to preview its case or expose its legal theories," *United States* v. *Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977), and therefore "[t]he ultimate test must be whether the information sought is necessary, not whether it is helpful," *United States* v. *Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001)

To determine whether the charges in the Indictment are "so general" that they require a bill of particulars, this Court considers information beyond the Indictment, including all discovery supplied to the Defendants to date, and all information voluntarily disclosed by the Government over the course of the case. *See United States* v. *Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *United States* v. *Cuti*, No. 08 Cr. 972 (DAB), 2009 WL 3154310, at *3-4 (S.D.N.Y. 2009) (denying request for bill of particulars listing fraudulent transactions, payments, and statements in accounting fraud case where Government provided comprehensive

discovery and a list of certain transactions).

Although the Government's provision of "mountains of documents to defense counsel who [a]re left unguided as to which documents" are relevant to the charges does not substitute for a bill of particulars where one would otherwise be required, *see Bortnovsky*, 820 F.2d at 575; *United States* v. *Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the provision of voluminous discovery in combination with some guidance about what is most relevant can vitiate a need for further particulars, *see, e.g.*, *Kazarian*, 2012 WL 1810214, at *25; *United States* v. *Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010); *Mitlof*, 165 F. Supp. 2d at 569.

The "'wheres, whens and with whoms'" are "beyond the scope of a bill of particulars." *Mitlof*, 165 F. Supp. 2d at 569 (citing *Torres*, 901 F.2d at 233-34). "A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory." *United States* v. *Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003).

There is no basis for a bill of particulars in this case. The charges against the defendants are explained in detail in the lengthy speaking Indictment, and the charges track the language of the applicable statutes while stating the time and place in approximate terms of the charged conspiracy.

As the Indictment describes and as recounted above, Carroll and Pappagallo participated in an accounting fraud scheme in which they and their co-conspirators caused Brixmor to report false SS-NOI Growth numbers in public quarterly filings from the third quarter of 2013 to the third quarter of 2015. (Indictment ¶¶ 15-35). The defendants caused Brixmor to falsely inflate

and deflate these quarterly SS-NOI Growth figures in order to ensure that they were consistent on a quarterly basis with Brixmor's publicly announced annual guidance for SS-NOI Growth and to mislead shareholders and the investing public into believing that Brixmor achieved smooth growth from quarter to quarter. (Indictment ¶ 41). The Indictment provides: (1) an explanation of the accounting metric at issue (¶¶ 9-14); (2) the specific public filings in which Brixmor falsely reported the metric (¶¶ 15-17); (3) the Defendants' role in touting the materiality of that metric to the investing public (¶¶ 18-19); (4) three accounting schemes by which the Defendants and their co-conspirators manipulated that metric (¶¶ 22-32); (5) particular instances of the defendants and co-conspirators discussing and using specific accounting items as part of the fraud (*E.g.*, ¶¶ 25-27, 29(a), 31); and (6) a description of the effect of the defendants' fraud on the reported metric (¶¶ 33- 35).

On the basis of the 32-page Indictment alone, the Government has furnished a sufficient basis to deny the Defendants' motions. *See, e.g.*, *United States* v. *Ferrarini*, 9 F Supp. 2d 284, 299 (S.D.N.Y. 1998) (denying bill of particulars where "indictment alone . . . discloses sufficient information to inform the defendants adequately of the charges against them").

But the Government has also provided the Defendants with "nearly one hundred thousand documents" in discovery. (Dkt. No. 50, Pappagallo BOP Br. at 2.) The Defendants had months to review the discovery, even seeking the guidance of accounting experts to assist their defense and their review of these materials. (Dkt. No. 65, Gov. Opp. Br., at 26.) Nor have the Defendants shrunk from expanding the scope of discovery in this case: for example, Carroll sought all documents in his email account for a five-year period, and Pappagallo sought all emails from two co-conspirators' email accounts and emails referencing eight broad subject

13

areas from numerous other Brixmor employees' email accounts. (*See* Court's Order dated Jan. 9, 2020, ECF Docket No. 62). Defendants have marshalled the fruits of those efforts to support their other motions (*see, e.g.*, Carroll MTD Br. 4, 7-8 (citing several specific items in the discovery), which is further proof that they have a firm grasp of the accounting issues giving rise to the charges in this case.

Defendants argue that the Government is required to provide even more detail in "transactions-based cases." (Dkt. No. 52, Carroll BOP Br. at 7.) However, this is not a case that involves hundreds of thousands or millions of purported instances of fraud, as in two cases cited by Carroll -- *United States* v. *Connolly*, No. S1 16-CR-00370 (CM), 2017 WL 2537808 (S.D.N.Y. May 24, 2017) (fraud related to daily interbank lending transactions), and *United States* v. *Vaid*, No. 16 CR. 763 (LGS), 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017) (500,000 fraudulent Medicare claims). This is a relatively narrow case focused on a single accounting metric as reported during the quarters indicated in the Indictment.

Even so, the Government represents that it has obliged the Defendants' requests by providing the Brixmor Audit Committee's work papers, which the committee compiled in order to cooperate with the SEC's investigation of the accounting entries at issue. (*See*, Dkt. No. 51, Filor Declaration Ex. D (September 27, 2019, letter from the Government), at 1-2.) Those work papers include spreadsheets which total the impact of the fraud on Brixmor's quarter-by-quarter SS-NOI Growth. Furthermore, after producing the Audit Committee materials, the Government explained in detail how the Audit Committee and the SEC narrowed the scope of the investigation to home in on particular accounting entries, thereby substantially reducing the number of relevant accounting entries that Defendants may wish to review in advance of

14

trial. (*Id.* at 6-8.) The Government also offered to assist the Defendants in answering their "questions with respect to any particular accounting entries or any particular communications about the fraud." (Dkt. No. 54, Diamond Declaration, Ex. G (October 16, 2019, letter from the Government), at 4.)

In light of the Government's detailed indictment, extensive productions, and particular Audit Committee documents composed with an eye toward the specific accounting entries underlying the charges in this case, the Court is satisfied that the government has "identif[ied] with sufficient particularity the nature of the charge[s] pending against [t]he defendants." *U.S. v. Bortnovsky*, 820 F.3d 572, 574 (2d Cir. 1987).

Pappagallo asks for particulars about the Government's accounting "rationale" and the "facts upon which it relies to support its conclusion" that any particular accounting entry was fraudulent. (Dkt. No. 50, Pappagallo BOP Br. 2). Granting Pappagallo's request as to each particular accounting entry would essentially require the Government to divulge its legal theories, its trial evidence in all of its detail, and its witness testimony, which it is not required to do. *See Mitlof*, 165 F. Supp. 2d at 569 ("The Government may not be compelled to provide a bill of particulars disclosing . . . a preview of the Government's evidence or legal theories."); *United States* v. *Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) ("[T]he law does not impose upon the Government an obligation to preview its case or expose its legal theories."). Pappagallo is free to argue that certain of the accounting entries were not fraudulent, meaning not adjusted in the manner alleged in the Indictment. However, he is not entitled to have a full presentation of the Government's case today.

Carroll seeks a list of all false accounting entries the Government plans to reference at

15

trial. (Dkt. No. Carroll BOP Br. 17). This request for a partial exhibit list is nothing more than an attempt to force the Government prematurely limit its own case at trial. The only effect of requiring the Government to submit such a list would be to "restrict unduly the Government's ability to present its case," *Feola*, 651 F. Supp. at 1132, including its ability to respond to defense arguments or evidence presented during trial, and "to foreclose the Government from using proof it may develop as the trial approaches," *Samsonov*, 2009 WL 176721, at *3. There is no question that such a list would certainly be helpful to Carroll in preparing his defense. However, that is not the standard for ordering the government to produce a bill of particulars.

The Defendants' request for a bill of particulars is denied in its entirety.

### III. CARROLL'S MOTION TO COMPEL IS DENIED.

Defendant Carroll moves for an order compelling the Government to produce all notes and summaries of its interviews with Carroll's alleged co-conspirator Steven Splain. (Dkt. No. 43 (the "Discovery Motion").) The Government interviewed Splain three times while he was a party to a common interest privilege agreement with Carroll, and Carroll now seeks the Government's records of those discussions "to ensure that [the Government] did not elicit from Mr. Splain information about privileged communications with Mr. Carroll." (Dkt. No. 72, Carroll Omnibus Reply, at 23.) Specifically, Carroll seeks discovery to determine whether the Government improperly questioned Mr. Splain regarding Carroll's defense of this case. *See, e.g.*, *Weatherford v. Bursey*, 429 U.S. 545, 554 (1977) (likely Sixth Amendment violation if

"prosecution learned [from a cooperating witness] . . . the details of . . . conversations about trial preparations").

The law in this Circuit establishes "the proposition that a surreptitious invasion by a government agent into the legal camp of the defense" may violate the Sixth Amendment, at least where the invasion is sufficiently "pervasive and pernicious." *United States* v. *Mosca*, 475 F.2d 1052, 1060 (2d Cir. 1973). The Discovery Motion depends upon the premise that the Government may have violated Carroll's Sixth Amendment rights when questioning Splain about two phone calls he had with Carroll in early February 2019, during which Carroll asked Splain if he had any information regarding the Government's investigation. (Dkt. No. 45, Diamond Declaration, Ex. B at 2.) The Government disclosed its knowledge of these calls to Carroll in a September 27, 2019 letter. (*Id.*)

In response to Carroll's claim that those calls may have touched upon Carroll's legal strategy, and that Splain's potential discussion of those calls with the Government may have violated Carroll's Sixth Amendment rights, the Government provided Defendant with the notes of its subsequent discussions with Splain's attorney. (Diamond Decl. Ex. C at Appendix C). Those records give me no reason to believe that Carroll and Splain engaged in any substantive conversation about Carroll's legal strategy, or that the Government ever asked Splain about said strategy. (*Id.*)

Absent facts showing that the Government ever solicited Carroll's privilege information from Splain, this Court has no basis to conclude that the Government ever "invaded" the defendant's "legal camp," let alone did so pervasively and perniciously. Likewise, there is no basis to draw the subsequent inference that the Government interfered with Carroll's legal

17

strategy through its conversation with Splain's attorney. As the Second Circuit has explained, "there can be no violation of the sixth amendment without some communication of valuable information derived from the intrusion to the government: absent such communication, there exists no realistic possibility of either prejudice to the defense or benefit to the government." *United States* v. *Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985). Therefore, the Discovery Motion does not convince this Court that any further discovery is necessary to investigation the potential infringement of Carroll's Sixth Amendment rights.

Carroll would arguably not be entitled to further discovery even if he had discussed legal strategy with Splain during the February calls, and even if the Government had gleaned that information from Splain in violation of the common interest doctrine. Just as there can be no right without a remedy, so too there can be no remedy without a right. "For a Sixth Amendment right . . . to attach, adversarial proceedings must have commenced against an individual, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Vasquez*, 675 F.2d 16, 16–17 (2d Cir. 1982) (quotation marks omitted). Because the Government interviewed Splain five months before the Indictment was filed with this Court, Carroll's Sixth Amendment right had yet to attach in connection with this case. For that reason, a motion to suppress evidence gleaned from the Splain on the basis of prosecutorial interference with Carroll's preparation of his defense would be equally fruitless.

The Discovery Motion is denied.

## IV.    CARROLL'S QUEST FOR *BRADY* MATERIAL

Carroll asks the Court for an order compelling the Government to commence two reviews for possible exculpatory material pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963). First, he

seeks the compelled review of the SEC's internal files related to its parallel investigation—Carroll says joint investigation—of Brixmor; specifically, files pertaining to the SEC's internal deliberative processes for evaluating the case.

Second, Carroll wants any documentary evidence in the Government's possession from another case—*United States* v. *Block*—that Adjusted Funds From Operations ("AFFO"), a metric wholly separate from SS-NOI and SS-NOI Growth, is "the single most important financial measure" used by REITs.

"The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States* v. *Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (quoting *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963)). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *Id.* "With respect to when the prosecution must make a disclosure required by *Brady* . . . *Brady* material must be disclosed in time for its effective use at trial or at a plea proceeding." *United States* v. *Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) (*quoting Coppa*, 267 F.3d at 135) (emphasis in original).

A prosecutor's duty to review files for *Brady* material extends to reviewing information in the possession, custody, or control of another agency where the Government conducts a "joint investigation" with that agency. *United States* v. *Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, at \*2 (S.D.N.Y. Jan. 15, 2008), *aff'd*, *United States* v. *Rigas*, 583 F.3d 108 (2d Cir. 2009) (holding that there was "no joint investigation with the SEC" and

19

therefore the Government did not need to produce documents in the custody of the SEC); *United States* v. *Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (Chin, J.) (holding that the Government and the NYSE, even if it were a state actor, did not conduct a joint investigation related to the policies of the NYSE).

Although the Second Circuit has not spoken directly to the question of what constitutes a joint investigation triggering a duty to review for Brady, the majority of district courts have concluded that, standing alone, joint fact gathering is not sufficient to trigger an extension of the Government's *Brady* obligations. However, in two cases, judges in this District have concluded that certain types of joint fact gathering may trigger a limited obligation on the Government to review the files of another agency. In *United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012), Judge Rakoff ordered the Government to review for *Brady* SEC documents memorializing witness interviews that were conducted jointly by the SEC and the Government. In so doing, however, Judge Rakoff made clear that his finding did "not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint investigation" such that they would need to be reviewed for *Brady*. *Id*. at 495. In *United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014), Judge Gardephe ordered the Government to review a narrow subset of SEC memoranda relating to cooperating witnesses. *Id*. at 462. In neither case did the court conclude that joint fact gathering would give rise to an obligation by the Government to review the SEC's entire investigative file.

"A number of factors are relevant in determining whether the prosecution conducted

20

a 'joint investigation,' including whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States* v. *Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (*citing United States* v. *Blaszczak*, 308 F.Supp.3d 736, 741-42 (S.D.N.Y. 2018)).

## A.  The Request for Review of SEC Files

The Indictment in this case came at the conclusion of investigations into accounting practices at Brixmor by the Government and the SEC's New York Regional Office. On the day that the Indictment in this case was unsealed, the SEC announced the filing of an enforcement action in this District against Pappagallo, Carroll, Splain, and Michael Mortimer, another former Brixmor employee and participant in the scheme. *See Securities and Exchange Commission* v. *Michael Carroll*, 19 Civ. 7199 (AT).

The Government says that it is not familiar with the contents of the entire investigative file of the SEC and does not have custody of the files. However, the Government has made document requests of the SEC at defendant's request, and has turned over the SEC responsive documents to the defense. Defendant's sole remaining request in this regard is for documents pertaining to "the SEC's evaluation process." (Carroll Disclosure Br. at 12.). Carroll is interested in potential memoranda outlining SEC attorneys' opinions at various points in the investigation concerning the strengths and weaknesses of its own case. *Id.*

21

The SEC's internal deliberative documents—regarding its own, independent investigation—are not in the Government's possession, custody, or control. The request for them assumes that the parallel investigations conducted were, in fact, one joint investigation. But for the purposes of resolving this motion, the Court need not resolve whether the investigation is properly considered one or two, *i.e.*, joint or parallel. The Government has voluntarily agreed to undertake reviews of various items in custody of the SEC, should such items exist – specifically, testimony, proffers, witness statements, affidavits, declarations, transcripts, recordings, and presentations made or supplied to the SEC in connection with its investigation into this matter. The Government has represented that the SEC has represented to it that, to the extent there are SEC-generated deliberative materials of the sort Carroll seeks, they would not be the source of facts not otherwise identified in the materials the Government has already reviewed for potential *Brady*. According to the Government, the SEC has not, and has represented to the Government that it would not, share the deliberative portions of any SEC memoranda with the Government.

The thoughts and impressions of SEC staff concerning its case and investigation are not *Brady* material. The evidence that matters is not an attorney's opinion, but the underlying facts. Since the Government has conducted a broad review of the factual record of the SEC investigation at defendant's behest, it has more than satisfied there *Brady* obligation in this regard.

### B.     Request for Materials from *United States* v. *Block*

In September 2016, Brian Block, the former Chief Financial Officer of American

22

Realty Capital Partners ("ARCP"), a REIT, was arrested on a host of charges, including securities fraud, relating to his fraudulent inflation of AFFO, a non-GAAP metric used to evaluate the financial performance of publicly traded REITs that was included in ARCP's public filings. Underscoring the importance of these metrics to ARCP and the investing public, ARCP not only reported AFFO in its public filings, but also released to the investing public forward-looking forecasts of its expected AFFO and AFFO per share for future time periods, known as guidance. (Block Indictment ¶ 8).

The Block Indictment did not mention SS-NOI or any related metrics, nor did it indicate that any one metric represented the sole source of useful information about REIT performance to anyone in the REIT industry. Block was found guilty of numerous federal criminal offenses in June 2017 after a three-week trial before Judge Oetken. During the public trial, multiple witnesses from the investing public described AFFO as important to their consideration of a REIT's performance and prospects for future success.

The Indictment in the instant case does not make reference to AFFO. It also does not suggest that the importance of SS-NOI Growth or SS-NOI come at the expense of any other metric, or that SS-NOI and/or SS-NOI Growth were the sole or even dominant metrics used by REITs or analysts or investors following REITs. In its strongest formulation, the Indictment contains language indicating that "SS-NOI Growth was a key metric used by analysts and investors to evaluate a REIT's financial performance, including Brixmor's performance specifically." (Indictment ¶ 12).

AFFO is irrelevant. The mere existence of another popular REIT metric does nothing

23

to disprove the Government's contention that SS-NOI Growth was itself a key metric. The notion that the mere existence of any other metric of potential interest to the REIT investment community constitutes *Brady per se* for this case is absurd.

Moreover, the existence of AFFO as another non-GAAP metric utilized in the REIT space is certainly public knowledge and the transcript of the *Block* trial, including any references to AFFO, are a matter of public record. Any arguments made in *Block* about the role or import of AFFO were based on the public records in that case which are readily and easily accessible to Carroll.

This constitutes the decision and order of the Court.

April 14, 2020

Colleen McMahon
Chief Judge

BY ECF TO ALL PARTIES

24